421 A.2d 289

Bonnie Tokarek PALMER

v.

Eugene TOKAREK

v.

Gildo BERTETTO and Pearl Bertetto.

Appeal of Bonnie Tokarek PALMER and Gildo Bertetto and Pearl Bertetto, his wife.

Superior Court of Pennsylvania.

Argued April 16, 1980.

Filed July 18, 1980.

Thomas D. MacMullan, Pittsburgh, for appellants.

Gary F. Selway, Greensburg, for appellee.

Before CAVANAUGH, HOFFMAN and VAN der VOORT, JJ.

CAVANAUGH, Judge:

This appeal involves a dispute over custody of Paul John Tokarek, age eight. Three parties are involved in this action: the child's father (Eugene Tokarek), the child's mother (Bonnie Tokarek Palmer), and the maternal grandparents (Gildo and Pearl Bertetto). Eugene Tokarek filed a petition for custody in June of 1978. Two years prior to this a court order was entered placing custody in the mother with reasonable visitation to the father. Mr. and Mrs. Bertetto were granted permission to intervene and cross–pe-

tition for custody of P. J. Following a hearing, the lower court awarded custody of P. J. to his father with liberal visitation to Mr. and Mrs. Bertetto. Mrs. Palmer was awarded visitation at such times as the child is with the maternal grandparents. Due to the pendency of this appeal, the lower court granted a supersedeas directing that P. J. remain with his grandparents with visitation rights to Mr. Tokarek.

P. J.'s parents were married in February, 1971 after discovering that Mrs. Palmer was pregnant. After the marriage the father continued to live with his parents and the mother remained at her parents' home. On weekends the couple stayed at the Bertetto's but several months before P. J. was born they separated. They were divorced in 1972.

Following P. J.'s birth the mother returned to work and the grandparents assumed the normal duties of parents to P. J. At all times since his birth, P. J. has lived with his maternal grandparents save for a brief period in 1976. The child's mother also resided there until 1976 when she remarried and moved back to Rhode Island, taking P. J. with her. However, because of the child's anxiety at being separated from his grandparents, his mother returned P. J. to Pennsylvania.

P. J. has been cared for by his grandparents as if he were their own son. They have provided a home and have provided for his education, religious training and social needs. Although P. J. knows that the Bertetto's are not his natural parents, he refers to them as "Mum and Pop." The child's father has had visitation rights by order of court since August 3, 1971. In September, 1974 the court adjusted the visitation order to include weekend visitation. Although the father has had to enlist the aid of the court and the county Domestic Relations Department in order to enforce his visitation rights, he has made a consistent and persistent effort to visit P. J. since 1973. Concerning his obligation to support P. J., a support order was entered in April of 1971 and payments by the father pursuant to that order were irregu-

lar, resulting in an attachment of his wages in October, 1972. Since that time payments have been made on a regular basis. There are currently no arrearages.

The petition for custody filed in 1978 was the first attempt made by the father to gain custody of P. J. The father remarried in 1978 and procured living accommodations in a five-room house. The present Mrs. Tokarek has a son by a prior marriage who resides with her and P. J.'s father. The house has two bedrooms one for Mr. and Mrs. Tokarek and another, containing twin beds, for the two boys.

At trial two expert witnesses, Dr. Schachner, a psychologist, and Dr. Garrity, a psychiatrist, were called to testify as to the effect of a change of custody on P. J. Dr. Schachner, a witness for the appellants, testified that P. J. would suffer severe trauma if separated from his grandparents. Dr. Garrity disagreed, claiming that P. J. could withstand the pressure without permanent damage to his psyche. The court, finding both experts equally qualified, placed more emphasis on Dr. Garrity's report because of her disinterested posture as a court retained expert.

The lower court found that P. J.'s best interests would be served by awarding custody to his natural father with liberal and frequent visitation by the maternal grandparents. The standard of review this court will exercise was recently set forth in *In re Custody of White*, 270 Pa.Super. 165, 167–169, 411 A.2d 231, 232–3 (1979).

> [I]t is well established that the scope of review of this court in such disputes is of the broadest type. *Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635 (1977); *Commonwealth ex rel. Myers v. Myers*, 468 Pa. 134, 360 A.2d 587 (1976); *In re Custody of Neal*, 260 Pa.Super. 151, 393 A.2d 1057 (1978). Although we will not usurp the fact–finding function of the trial court, we are not bound by deductions or inferences made by the hearing judge from the facts as found. *Trefsgar v. Trefsgar*, 261 Pa.Super. 1, 395 A.2d 273 (1978); *Commonwealth ex rel. Ulmer v. Ulmer*, 231 Pa.Super. 144, 331 A.2d 665

464

(1974); *Commonwealth ex rel. Grillo v. Shuster*, 226 Pa. Super. 229, 312 A.2d 58 (1973). Because of the Commonwealth's legitimate and overriding concern for the well-being of its children, we are required to render an independent judgment based on the evidence and testimony and make such order on the merits of the case as to effect a just result. *Spells v. Spells*, 250 Pa.Super. 168, 378 A.2d 879 (1977); *Commonwealth ex rel. Zeedick v. Zeedick*, 213 Pa.Super. 114, 245 A.2d 663 (1968). So as to facilitate this broad review, we have consistently emphasized that the hearing court must provide us not only with a complete record, *Augustine v. Augustine*, 228 Pa.Super. 312, 324 A.2d 477 (1974), but also with a complete and comprehensive opinion which contains a thorough analysis of the record and specific reasons for the court's ultimate decision. *Martincheck v. Martincheck*, 262 Pa.Super. 346, 396 A.2d 788 (1979); *Tobias v. Tobias*, 248 Pa.Super. 168, 374 A.2d 1372 (1977); *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976). Absent an abuse of discretion, we will not reverse a hearing judge who complies with these requirements.

## I.

In awarding custody to the father, the lower court characterized the case as a dispute between a natural parent and the grandparents. As such the lower court allocated the burden of proof as is appropriate in such cases: the parents have a prima facie right to custody which will be forfeited only if convincing reasons appear that the child's best interests will be served by an award to a third party. *Hooks v. Ellerbe*, 257 Pa.Super. 219, 390 A.2d 791 (1978); *Ramos v. Rios*, 249 Pa.Super. 487, 378 A.2d 400 (1977); *In Re Custody of Hernandez*, 249 Pa.Super. 274, 376 A.2d 648 (1977).[1] Ap-

---

1. It is established that this burden of proof is to be applied to relative and non-relative alike. As this court stated in *In re Custody of Hernandez, supra*, to draw such a distinction in the burden of proof to be allocated "would be to indulge in over-refinement, which would distract the inquiry from the essential concern of the case–the child's best interest." 249 Pa.Super. at 287, 376 A.2d at 654–5

pellants argue that the case is actually a dispute between two natural parents. If such were the case, the burden of proof would be borne equally by the contending parents, each being required to show that an award to him or her would be in the child's best interest. *See Commonwealth ex rel. Spriggs v. Carson*, 470 Pa. 290, 368 A.2d 635 (1977); *Lewis v. Lewis*, 267 Pa.Super. 235, 406 A.2d 781 (1979); *Rummel v. Rummel*, 263 Pa.Super. 97, 397 A.2d 13 (1979). The lower court acknowledged that "if the parties stood in equal positions, this Court would have no difficulty in awarding custody to the grandparents because of their proven ability to provide for this child and because of the trauma which will undoubtedly result in this child because of a change in environment." Appellants note that the father sought custody from the mother and these parties' names appear on the original pleadings. The grandparents intervened because of their involvement in the case. However, looking beyond form to substance, we find appellants' argument untenable.

■ Appellants attempt to distinguish this case from other cases involving disputes between a third party and a natural parent. Here, they argue, the parent seeks to have the child remain with the third party whereas in *Hernandez*, as well as *Hooks*, the third parties sought custody for themselves. Appellants cite no authority for such a distinction, nor does any exist. To permit such a distinction would, in effect, give the third party equal status with a natural parent as long as the parent not seeking custody prefers that the child remain with the third party. Such a result would be inconsistent with the court's overriding concern for the best interests of the child and the recognized rights of natural parents to custody.

The lower court explained the unusual position of the parties in the following finding of fact:

> While the natural mother is a party to this proceeding, she does not seek custody for herself; rather, her desire is that the child remain with her parents . . .

(footnote omitted). *Hooks, supra*, and *Ramos, supra*, both involved a dispute between the natural father and a maternal grandparent.

The record bears this out, although the grandparents and mother characterize their claim as one for joint custody or custody in the mother alone. The mother stated that she has no intention of bringing P. J. to live in Westmoreland County where she resides with her present husband and baby daughter. P. J. and the Bertettos live in Allegheny County. The Bertettos act as parents in every way to P. J. and have done so since his birth. The mother indicated during direct examination that she wishes this to continue:

Q. So now, without using any psychological terms, just tell the Court again in your own words what you think is the best for P. J.

A. He loves his mom and dad, which are my parents, in regard that they raised him. He loves them.

Q. All right. What do you believe or where do you think P. J. should be?

A. With them.

(N.T., April 3, 1979, p. 251.)

In view of the foregoing we hold that the lower court properly treated the dispute as one between a parent and a third party. Thus, the father was entitled to custody unless convincing reasons could be shown that the child's best interest would be served in an award to the grandparents.

## II.

Appellants contend that even under the standards applicable to a custody dispute between a natural parent and a third party the court erred in awarding custody to the father. They claim that it is undisputed that the grandparents are suitable guardians and that P. J. exhibited an emphatic, unwavering preference to remain with his grandparents. Also, appellants argue that P. J. will suffer severe trauma if separated from his grandparents, and that the father is an unfit parent.

### A.

In addressing the suitability of the grandparents as guardians, we note that *Ramos v. Rios, supra,* is similar to the

instant case. There, a father sought to regain custody of his daughter who had been placed in the custody of her maternal grandparents following the mother's death. The lower court found that the child's best interest would be served by an award to either party. However, since the court had failed to give weight to the parents' prima facie right to custody the case was remanded. Similarly, in *Hooks v. Ellerbe, supra,* a father was awarded custody over the maternal grandmother. There, the daughter, Carla, age twelve, had lived with her grandmother from the time she was less than two. This court stated:

> Not only does Carla appear to have a good and loving relationship with her grandmother, but all of her friends live in the same neighborhood, she is active at the local church, and her stepbrother, Derrick, lives "two doors" away and comes by most days to help her with her homework.

257 Pa.Super. at 224–5, 390 A.2d at 794. Despite these facts the parent's prima facie right to custody had not been overcome. *See also Commonwealth ex rel. Strunk v. Cummins,* 258 Pa.Super. 326, 392 A.2d 817 (1978); *In re Custody of Hernandez, supra.*

██ Even P. J.'s clear preference for remaining with his grandparents does not outweigh the father's prima facie right to custody. Although a factor, a child's preference is not dispositive of the issue of custody. As this Court has stated:

> It is true that a child's stated preference may be sufficient to support a conclusion that a change of custody is warranted. *Carlisle Appeal,* 225 Pa.Super. 181, 310 A.2d 280 (1973). It is also true that as a child grows older more weight should be given to the child's preference. *Tomlinson v. Tomlinson,* 248 Pa.Super. 196, 374 A.2d 1386 (1977); *Williams v. Williams,* 223 Pa.Super. 29, 296 A.2d 870 (1972). However, a court must not simply accept the child's statement of preference; instead the court must critically examine the reasons underlying the child's statement, for a too ready acceptance of the statement would

be in effect an abdication by the court of its responsibility to decide for itself what will be in the child's best interest. *Shoup v. Shoup*, 257 Pa.Super. 263, 390 A.2d 814 (1977, Dissenting Opinion 257 Pa.Super. at 266 [390 A.2d 814] (1978)).

*Hooks, supra,* 257 Pa.Super. at 227, 390 A.2d at 795.

■ At the time of trial P. J. was seven years old. He had been reared in the loving home of his grandparents since birth. The record demonstrates that, unfortunately, there is ill feeling between the child's maternal grandmother and his father. According to the report of Dr. Garrity (R. 38a–39a), P. J. is afraid of his father although he admitted that his father has never hurt him in any way. In the report it was also stated that P. J.'s dislike and fear of his father are a repetition of the grandmother's dislike of her former son–in–law.

When questioned as to his preference, P. J. stated that he did not wish to stay with his father "[b]ecause they don't treat me right; they don't treat me like my mom and pappap [his grandparents] do" (Tr. April 3, 1979, p. 390). The Court questioned P. J. on this:

Q. How do they treat you that's different than the way your mom and pappap treat you?

A. They spank me a lot of times, and I don't want to go there because every time when we get up in the morning, we're not allowed to make noise because, like playing and that, because the next door neighbors, so we don't get to play. We can't get the toys out. Sometimes we're allowed to get toys and they make us do things.

Q. Like what?

A. Like get something; things like telling us to get stuff. They tell us to get things.

Q. What kind of things?

A. Like toys, pick them up; like pick them up.

Q. Don't you like to pick up toys? Don't your mom and pappap make you do that?

A.  No, they do it.

Q.  I see.  Do they let you get out of bed whenever you want to?

A.  No.

Q.  Your mom and pappap?

A.  Yes, yes.

(N.T., April 3, 1979, pp. 390–1).  And later:

Q.  . . .  Well, don't you want to see your father?

A.  No.

Q.  At all?

A.  No.

Q.  Why do you say that?

A.  Because I don't like it up there.  They don't treat me like my mom and pappap do.

(N.T., April 3, 1979, p. 393).  The fact that a potential custodian is more or less strict is doubtless an important factor to a seven year old in determining his preference. However, this Court must look beyond the desires of the child towards his best interest.  P. J. expressed a natural desire to remain with his grandparents in the lifestyle he has been accustomed to since birth.  However, this preference for consistency must be outweighed by the right of the natural parent to custody.  Therefore, we conclude that the fact that P. J. has been well cared for and loved by his grandparents, and that he prefers to remain with them does not amount to such convincing reasons as would overcome the father's right to have P. J. with him.

### B.

The lower court concluded that P. J. would, following some behavioral problems, be able to adjust to a change of custody with no permanent damage to his psyche.  Appellants, however, argue that P. J. will suffer severe trauma upon separation from his maternal grandparents if custody is awarded to the natural father.

Both experts testified as to the effect on P. J. of separation from the "psychological parents," his grandparents. The trial judge summarized their testimony in his opinion:

The child psychologist who testified on behalf of the grandparents, Stephen P. Schachner, Ph.D., is of the opinion that the child would suffer trauma if he is removed from his grandparents and that his development would not occur and would be hampered. The psychiatrist selected by this Court to examine the child, Gene C. Garrity, M.D., agrees that it would be very difficult for the child to accept a change in his environment, and that he might exhibit some behavioral problems such as bed wetting, and sleeplessness. Dr. Garrity nevertheless, however, is of the opinion that because of the solid early development and good early care of the child he could withstand this pressure without damage to his psyche. This Court is therefore faced with conflicting predictions by two experts with regard to future consequences of separation from the grandparents.

Appellants claim that the conclusion of the lower court that "[t]his Court is therefore faced with conflicting predictions by two experts with regard to future consequences of separation from the grandparents" is without support in the record. However, this claim is without merit. Although both experts agreed that P. J.'s transitional or adjustment period would be difficult emotionally, they disagreed as to the impact of separation from the grandparents on P. J.'s future development. Dr. Schachner testified as follows:

A. In my professional opinion I think P. J. would respond traumatically in a very upset manner to a relation of custody in that direction. I believe that he would be very upset over the separation; he would become anxious, depressed, he would regress in terms of some childhood behaviors. Occasionally children will become bedwetters, or they may be very whiny and difficult to deal with, and be very unhappy over an extended period of time. The natural and growth

development, relationships, and the degree of comfort would be severely hindered by that final separation.

(N.T., April 2, 1979, pp. 58–59). Whereas Dr. Garrity stated:

So, that I do think that his upbringing to this point has been excellent. But, I don't feel, as does Doctor Shackner, that this would create such trauma to his psyche that he would not recover from it. I think any changes made, the boy would certainly find it difficult. I think that probably whichever parent he might be with would have to receive some kind of counselling, if not therapy, in order to accomplish any change in his life but because he is so solid, I don't think that this would create any real problem for the boy.

(N.T., July 26, 1979, p. 7).

The lower court chose to give more weight to the testimony of Dr. Garrity and gave its reasons for so doing in its opinion:

While Dr. Schachner is well qualified in his field and impressed this Court with his testimony, he nevertheless was retained by the grandparents to testify in this custody dispute. On the other hand, Dr. Garrity, having been retained by the Court, is completely disinterested in the outcome of the proceedings, and the Court places more emphasis upon her report because of that fact, together with her equally impressive qualifications.

Therefore, we will not disturb this conclusion of the trial judge.

## C.

■ Appellants also argue that the custody award to the father is improper because he is an unfit parent. They claim that certain evidence, which bears on the father's fitness, was not addressed by the court in its opinion.

First, appellants claim that the father has exhibited his unfitness in his use of profane language and his tendency to violence. In support of this argument, appellants point to the fact that the father used profanity in an argument with the natural mother approximately eight years prior to the

hearing. Appellants also point to two notes containing profanities written by the father to P. J.'s grandmother. Certainly, the use of a profanity eight years ago has no bearing on appellee's fitness as a parent. Likewise, the note to which appellants refer demonstrates that the father was concerned about P. J.'s ability to control his bowels and suggested P. J. be taken to a doctor. Thus, the unfortunate choice of words does not in any way reflect on the father's ability to care for P. J.

In addition, one of appellants' witnesses, John Lattanzi who occupies the other half of the duplex where the father resides, testified that he often heard violent arguments between appellee and his present wife. Mr. Lattanzi also testified that the father used profanity during these arguments and that two years prior to trial the father allegedly threatened his wife by saying, "I'd blow your brains out; it wouldn't bother me one bit." (N.T., April 2, 1979, p. 183). Mr. Lattanzi's mother, who testified for the father, contradicted her son's testimony. Even assuming the truth of Mr. Lattanzi's testimony, appellant has failed to show its effect on P. J.'s welfare. There is no evidence on the record that the father used profanity in P. J.'s presence or was violent in front of or towards P. J.

The father's right to custody is forfeitable only by misconduct or other factors *which substantially effect the child's welfare.* *Johnson v. Pinder,* 217 Pa.Super. 180, 269 A.2d 511 (1970); *Commonwealth ex rel. Insalaco v. Delconte,* 201 Pa.Super. 354, 192 A.2d 750 (1963), aff'd 413 Pa. 221, 196 A.2d 353 (1964); *Commonwealth ex rel. Sabath v. Mendelson,* 187 Pa.Super. 73, 143 A.2d 665 (1958). Because appellants have not shown that the alleged misconduct of the father in any way affects P. J.'s welfare, we hold that such conduct cannot be said to bear on the father's right to custody.

Appellants point to other acts of the father which at least to some degree involve P. J. The first of these incidents occurred when the father came to the grandparents' home for a scheduled visitation. According to the testimony of

the Bertetto's neighbor, she was with the grandmother in her yard one day when the father arrived to pick up P. J. She recalled that the father called to P. J. and when P. J. hesitated the father threatened him by saying, "P. J., are you coming? . . . You want the cops to come and get you?" (N.T., April 2, 1979, p. 374.) This recounting of the testimony by appellants, however, fails to disclose the fact that this incident occurred during a time when the father was required to have a constable accompany him to the grandparents' home in order to enforce his right to visitation.[2] Viewed in the proper context appellants' argument is spurious.

Finally, appellants allege that the father lied concerning P. J.'s attendance at Sunday school classes. It is true that the father's testimony that P. J. was taken regularly to these classes was contradicted by the testimony of the catechism teacher who compiled an attendance record. Appellants note that the lower court never addressed this testimony or the question of the credibility of the natural father in its opinion. They cite *Garrity v. Garrity*, 268 Pa.Super. 217, 407 A.2d 1323 (1979) and *Rupp v. Rupp*, 268 Pa. Super. 467, 408 A.2d 883 (1979) for the argument that this court should remand the case because of a lack of detailed analysis as to credibility. We disagree. Even if the trial judge did not believe the father's testimony concerning P. J.'s attendance at Sunday school, this would not be inconsistent with the court's finding that the father is a fit parent. Certainly this discrepancy alone cannot provide convincing reasons outweighing the father's prima facie right to custody. Although an analysis as to credibility would have been helpful to us in reviewing the holding of the court below, it cannot be said that "[t]he opinion is devoid of the type of detailed analysis as to credibility which is essential before we may render a considered opinion on appeal." *Garrity v. Garrity*, 268 Pa.Super. at 224–225, 407

---

2. The lower court found as a fact that "[b]ecause of difficulties in exercising the visitation privileges granted by the court, the father had to enlist the aid of the Domestic Relations Department of Westmoreland County on several occasions."

474

A.2d at 1327. Thus the lower court was correct in concluding that appellants failed to overcome the father's prima facie right to custody. There was ample evidence to support the court's conclusion that it "finds the natural father to be a fit parent and is convinced of his sincerity in trying to reestablish himself as the father of this child and to engraft this child onto his present family situation."

### III.

Appellants contend that it was improper for the court to rely on the report of a court–appointed psychiatrist without first submitting the report to the parties. The lower court ordered that P. J., the natural parents and maternal grandparents be examined by Gene C. Garrity, M.D., a child psychiatrist, and that her report be sent directly to the court. Relying on this court's opinion in *Rummel v. Rummel*, 263 Pa.Super. 97, 397 A.2d 13 (1979), appellants claim that the report should have first been submitted to their counsel.[3]

Appellants' reliance on *Rummel* is misplaced. There, the trial court relied on extra–judicial reports without taking testimony and giving the parties an opportunity to cross–examine the individual who made up the report and/or to present rebuttal testimony. This court in *Rummel* based its holding on *Wood v. Tucker*, 231 Pa.Super. 461, 332 A.2d 191 (1974), also a custody case wherein it was stated:

3. In their brief, appellants claim that they objected to this procedure, requesting that the report first be submitted to counsel. However, there is some confusion in the record as to whether such an objection was made prior to Dr. Garrity's testifying. Appellees concede that appellants filed an Objection to Evidence and an Amended Objection to Evidence and mailed a copy to opposing counsel and to the trial judge. However, appellees claim that notice to present the motions to the court was never given; the motions were never presented to the trial court; and the orders appended to the motions have never been granted or denied. The record bears out appellee's claim. However, because waiver does not obtain in a child custody dispute, *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976), we will consider appellant's claim assuming the proper procedure was followed.

. . . Reports of investigators, agents and doctors cannot be received in evidence, or considered by the court, in a contested case [citations omitted]. The investigators, agents, doctors, etc., must themselves be produced, sworn and examined as witnesses and be subject to cross–examination . . .

231 Pa.Super. at 463, 332 A.2d at 192, *quoting Commonwealth ex rel. Oncay v. Oncay*, 153 Pa.Super. 569, 570, 34 A.2d 839 (1943). *See also Kessler v. Gregory and Catholic Charities, Inc.*, 271 Pa.Super. 121, 412 A.2d 605 (1979). *Woods* makes clear that these cases stand for the proposition that the right of a litigant to *in–court presentation* of evidence is essential to due process. 231 Pa.Super. at 463, 332 A.2d at 192.

The record discloses that the trial court conducted an extensive examination of Dr. Garrity as to her credentials and the contents of her report. Counsel for both sides conducted cross–examinations of Dr. Garrity. Appellant noted his objection to Dr. Garrity's testimony on the ground that counsel had not received a copy of the report prior to its submission to the court. The objection was overruled. The report was made a part of the record.

We hold that the in–court examination of Dr. Garrity fulfilled the requirements of *Woods* and *Rummel. See also Sipe v. Shaffer*, 263 Pa.Super. 27, 396 A.2d 1359 (1979).

## IV.

Appellants object to the lower court's award of visitation to P. J.'s mother. The lower court's order states, "[t]he natural mother shall have the right to visit with the child at such times as the child is with the maternal grandparents." Appellants argue that the mother should have been awarded independent visitation. This court has recognized that visitation rights of a parent not in custody must be carefully guarded. *Spells v. Spells*, 250 Pa.Super. 168, 378 A.2d 879 (1977). It is undisputed that Mrs. Palmer has a right to visitation. *See Commonwealth ex rel. Fetters v. Albright*, 266 Pa.Super. 583, 405 A.2d 1260 (1979); *Strapple*

*v. Strapple,* 263 Pa.Super. 187, 397 A.2d 809 (1979); *Scarlett v. Scarlett,* 257 Pa.Super. 468, 390 A.2d 1331 (1978). Appellants apparently contend that awarding visitation to Mrs. Palmer and her parents simultaneously infringes on the mother's right to visitation. However, the record does not disclose any desire on the part of the mother to obtain independent visitation; rather, the record supports the hearing judge's finding that the mother desired "that she be allowed to visit with the child while he is in her parents' custody." It was clear from her testimony that she was seeking to maintain this status quo. Therefore, she cannot be heard to complain now when her request has been granted.

We find that the visitation rights of the mother have been carefully guarded. This is especially true in light of the unusual relationships involved herein and the mother's stated preference that the parental relationship between P. J. and his grandparents continue. (N.T., April 2, 1979, p. 251).

## V.

Finally, appellants argue that this court should vacate the Order of the lower court and remand in order that independent counsel be appointed to represent the child. Appellant cites *Lewis v. Lewis,* 271 Pa.Super. 519, 414 A.2d 375 (1979) as support for their claim. Although in *Lewis* this court recognized independent counsel may be required where the "bitterness which exists between their parents may result in the children's interest being thrown aside" (at 527 of 271 Pa.Super., at 378 of 414 A.2d), this is not the case before us. Throughout the proceeding below the focus of all parties was clearly P. J.'s best interest and not the ill–will existing between appellants and the natural father. Therefore, independent counsel for P. J. was not required and, in fact, the presence of such counsel may have worked to create an adversarial atmosphere between P. J. and the parties that would not otherwise have existed. *See Lewis* (at 526–527 of 271 Pa.Super., at 378 of 414 A.2d).

Because appellants have failed to show convincing reasons why P. J.'s best interests would *not* be served by an award of custody to the father, we affirm the order of the court below.

Order affirmed.