467 A.2d 359

**Paul M. MOORMAN and Diana C. Moorman, husband and wife**

v.

**J.B. TINGLE and Alma Tingle, husband and wife, Appellants.**

Superior Court of Pennsylvania.

Argued March 29, 1983.

Filed Oct. 14, 1983.

Petition for Allowance of Appeal Granted Mar. 7, 1984.

350

Susan H. Wilkie, Pittsburgh, for appellants.

Richard A. Bell, Clearfield, for appellees.

Before CAVANAUGH, BROSKY and MONTGOMERY, JJ.

BROSKY, Judge:

In this appeal, we are asked to review an order awarding custody of Michael David Shofestall to his mother, Diana C. Moorman. Appellants, the Tingles, are Michael's maternal grandparents with whom he lived for most of his first 5½ years and who ask that custody be awarded to them. For the reasons that follow, we affirm.

Diana Moorman became pregnant with Michael in 1976 when she was an adolescent. She married his father before Michael was born, but the union was a short one, ending in divorce the following year. For a period prior to and around the time of their divorce, Diana and for some time, her husband, apparently resided in a trailer located on her parents' property. It is undisputed that Michael lived on his grandparents' property and was largely under their care from the time he was approximately six weeks old. Diana resided at her parents' residence, apparently with some irregularity, until November, 1977 when she decided at the suggestion of a sister to move from their home in Rockton, Pennsylvania to Dayton, Ohio. In January, 1978, Diana began studying at Wright University where she was also employed.

Prior to her move, Diana requested that her parents care for Michael. Diana claims that it was understood that the arrangement was to be a temporary one; her parents disclaim any such agreement. In any event, Diana and Michael's father agreed in November, 1977 that her parents would have custody of Michael and both signed consent forms to that effect. The Tingles sought and received an

order of court awarding custody to them on December 30, 1977.

Diana visited with Michael following the custody award, although she and her parents disagree as to the frequency of such visits. The lower court found them to be "periodic."

In August, 1979, Diana married Paul Moorman, who was also a Wright University student. Their first child was born in June, 1980.

In March, 1980, Diana commenced legal proceedings to obtain custody of Michael. In August, 1980, a consent order was entered which provided that Diana would have gradually increasing periods of partial custody, culminating in full custody in approximately one year. Unfortunately, the parties did not comply with this order and in July, 1981, a hearing was held to determine custody.

Following that hearing and an additional one held in March, 1982, the lower court issued its orders of April 19 and April 21, 1982 which are the subjects of this appeal and which directed that custody be given to Diana Moorman.

Appellants raise several issues but primarily they contend that the lower court abused its discretion in awarding custody of Michael to his mother despite the testimony of psychologists who said that Michael would suffer irreparable harm if he were forced to move from his grandparents' home.[1]

It is well established that our scope of review in custody cases is broad.[2] *Sipe v. Shaffer*, 263 Pa.Super. 27, 396 A.2d 1359 (1979). Nonetheless, a broad scope of review should not be construed as providing the reviewing tribunal with a

1. Appellants' issues nos. 1, 5 and 6 essentially ask the same question and we will not refer to the stated issues separately, but respond to all in the following discussion.

2. We recognize that the issue of the proper scope of review applied in custody cases is presently before our *en banc* Court in the case of *In re Donna Williams*, 674 Pittsburgh, 1981, argued May 10, 1983; however, the exercise of a different scope of review in this case would not affect the result.

license to nullify the fact-finding functions of the court of the first instance. See *Albright v. Commonwealth ex rel. Fetters*, 491 Pa. 320, 421 A.2d 157 (1980). The trial court is in a better position to appraise the credibility of witnesses and we will reverse only for an abuse of discretion. We are not, however, bound by the conclusions or inferences drawn from the facts by the trial court. *Ferencak v. Moore*, 300 Pa.Super. 28, 445 A.2d 1282 (1982).

In *Ellerbe v. Hooks*, 490 Pa. 363, 367–8, 416 A.2d 512, 513–14 (1980), our Supreme Court adopted the standard to be applied in custody disputes between a parent and third party which was described by Judge Spaeth of our court in *In Re Custody of Hernandez*, 249 Pa.Super. 274, 286, 376 A.2d 648, 654 (1977), as follows:

"When the judge is hearing a dispute between the parents, or a parent, and a third party, ... [t]he question still is, what is in the child's best interest? However, the parties do not start out even; the parents have a 'prima facie right to custody,' which will be forfeited only if 'convincing reasons' appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the parents' side. What the judge must do, therefore, is first, hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side."

Appellants, therefore, were faced with a very heavy burden in their effort to retain custody of Michael. It is because we agree with the trial judge's conclusion that they failed to meet this burden that we affirm.

■ Appellants' main argument in support of their custody request is that Michael would suffer irreparable harm if separated from them. In support of this argument, they introduced the testimony of Dr. Patricia Piper, a psychologist who had been treating Michael periodically since 1980. Dr. Piper expressed the opinion that the trauma suffered by

Michael if he were forced to leave his grandparents would surely cause him to suffer psychological damage. She explained that the harm would result because Michael, who at the time of the hearing was 5½ years old, viewed his grandparents as the primary nurturing figures in his life and that Michael would have a less than 50 percent chance of recovering from the trauma.

Dr. Stephen A. Ragusea, a psychologist appointed by the court to perform psychological testing and evaluation of the parties also recommended in a report admitted into evidence, that custody remain with the Tingles. Dr. Ragusea noted particularly the anxiety that Michael suffered at the thought of leaving his grandparents. He did observe in his report, however, that he believed that anxiety could be alleviated if the Tingles were to adopt a different attitude toward their daughter.

Michael's pediatrician testified that Michael seemed to suffer some physical problems as a result of his anxiety about the situation, although we did not get the impression that he considered the problems to be serious.

The Moormans called as a witness Dr. William H. White, also a psychologist. Unlike Dr. Ragusea, who had interviewed and tested all of the parties, Dr. White's testimony was based almost solely on his review of the reports made by Dr. Ragusea and a one-hour interview with Mrs. Moorman. Dr. White testified that, inter alia, he believed that custody should be granted to the Moormans because their home offered a better climate for intimacy with the parental figures than did the Tingles.

The above-mentioned witnesses testified at the July, 1981 hearing. In March, 1982, an additional hearing was held at the request of the Moormans who presented at that time the testimony of Dr. Joseph S. Silverman, a psychiatrist who testified basically that although he believed that Dr. Ragusea had made a good report, he disagreed with Dr. Ragusea's conclusion that the principle of parental continuity should be the paramount concern of the court. Dr. Ragusea had concluded in his report that because Michael

had become "bonded" to the Tingles, he should remain with them. Dr. Silverman concluded that Michael's opportunity to grow intellectually, emotionally, philosophically would be greater in the Moormans' home than the Tingles'. Like Dr. White, Dr. Silverman had not interviewed Michael. His testimony was directed to his review and critique of Dr. Ragusea's report. Dr. Silverman said that he believed Michael would recover from the trauma caused by change in custody.

The lower court judge after reciting, as we have, the basic thrust of the experts' testimony, concluded that despite the fears of Dr. Ragusea and Dr. Piper, that Michael would be hurt by a change in custody, that he found that such damage would be remediable.

As a fact finder, it was clearly within the judge's purview to determine what of the testimony he considered credible. He was not required to accept as true the dire predictions of Drs. Ragusea and Piper. As Dr. Piper herself said, "Psychology is not the type of science that you can ... use numbers very specifically and accurately..."

The judge did not reject in this case, concrete, irrefutable, evidence. Instead, he determined that the testimony of the psychologists and Tingles was not sufficient to meet the heavy burden placed on the Tingles to show by convincing evidence that Michael's best interests would be served by awarding custody to them. See *Ellerbe, supra.*

Our conclusion that the judge did not abuse his discretion is supported by precedent in similar cases.

In *Palmer v. Tokarek,* 279 Pa.Super. 458, 421 A.2d 289 (1980), this court was presented with a similar situation.

The child in *Palmer* had lived with his maternal grandparents for almost his entire life. They had cared for him as if he were their son. The natural father sought custody of his son when the boy was approximately six years of age. The grandparents opposed the change and presented the testimony of a psychologist who said that the boy would suffer severe trauma if separated from his grandparents.

The lower court in *Palmer* awarded custody to the father citing the testimony of a court-appointed psychologist who had said that although the boy would find the move difficult, he could recover from the trauma.

Interestingly, we agreed that the trial court in *Palmer* correctly declined to grant custody to the grandparents on the basis that the child had stated that to be his preference. We wrote, "[T]his preference for consistency must be outweighed by the right of the natural parent to custody." Id., 279 Pa.Superior Ct. at 469, 421 A.2d at 295.[3]

Appellants urge us to distinguish the present case from *Palmer* since in the present case, the court appointed psychologist concluded that Michael would suffer harm from a custody change.

Admittedly, Dr. Ragusea's testimony was not as helpful to the appellee as was the testimony of the expert in *Palmer* to the father. Nevertheless, we find the principles enunciated in *Palmer* helpful.

In that opinion, we reiterated that the natural parents are not on equal footing with third parties. They are entitled to custody unless *convincing* reasons are shown that the child's best interests would be served by an award to a third party.

We note that Dr. Ragusea's report is far from completely favorable to the Tingles. True, he recommends that custody remain with them, but he does so based on a continuity theory. He also notes that when alone with the Moormans, Michael interacted well with them. He wrote, "It may be that much of the discomfort that Michael experienced during visitations (with the Moormans) could have been avoided had there been greater support from the Tingles and less tension between all the adults involved." Moreover, Dr.

**3.** But see Justice Flaherty's Concurring Opinion in *Commonwealth ex rel. Zaffarano v. Genaro,* 500 Pa. 256, 455 A.2d 1180 (1983), in which he criticizes the use of concepts like "right" with respect to custody cases and advocates strict adherence to the "best interest of the child" approach.

Ragusea found Mrs. Moorman well adjusted and to appear to have "good parenting skills."

Dr. Ragusea concluded that Mrs. Moorman sought custody of Michael because she believed that to be in his best interests.

Of Mr. Tingle, on the other hand, Dr. Ragusea wrote, The loss of his son many years ago in an accidental drowning greatly saddened Mr. Tingle. Indeed, in many ways, Michael appears to be his replacement for that lost child and this is one of the reasons why Mr. Tingle is struggling so hard to keep him.

Even in the segment of his report wherein Dr. Ragusea recommends that custody be awarded to the Tingles, he notes as disadvantages that they are somewhat rigid, limited by health and age (both were in their fifties at the time of the hearing, while appellees were in their early twenties). Importantly, he concludes, "Certainly, there are no grounds upon which to claim that they are grossly unfit to continue functioning as Michael's parents." We find this statement a telling one.

The Tingles are not entitled to custody just because they are not grossly unfit and have been Michael's caretakers; instead, the burden is on them to show why Michael's mother is unfit to care for him. That, they have not done.

See generally, *Commonwealth ex rel. Zaffarano v. Genaro*, 500 Pa. 256, 455 A.2d 1180 (1983); *Commonwealth ex rel. Davenport v. Montgomery County Children & Youth Services*, 305 Pa.Super. 545, 451 A.2d 781 (1982) (allocatur granted 2/17/83); compare: *Albright v. Commonwealth ex rel. Fetters*, supra.; *Ellerbe v. Hooks*, supra.

Appellants also argue that the lower court committed reversible error in admitting into evidence a letter from social workers whose letter contained the recommendation that the Moormans assume custody of Michael as well as the conclusion that the Moormans' home is "most appropriate." The authors of the letter did not testify and appellants argue that their letter is therefore hearsay.

The letter in question does not appear in the record before us, although the transcript of the July, 1981 hearing indicates that it was in fact admitted into evidence over appellants' objection. Therefore, we believe that although the original letter introduced at trial is not before us, we should comment on the propriety of its introduction. We note that we undertake to review the letter only because the record that we do have indicates that it was in part introduced. It is axiomatic that an appellate court will review only matters of record.

A copy of the subject correspondence contained in appellants' reproduced record indicates that it explains the conclusions of two Ohio social workers as to the suitability of the Moormans as parents and as to their financial status and condition of their home.

In *Palmer v. Tokarek,* 279 Pa.Super. 458, 475, 421 A.2d 289, 298 (1980), we explained:

... Reports of investigators, agents and doctors cannot be received in evidence, or considered by the court in a contested case [citation omitted]. The ... agents ... must themselves be produced, sworn and examined as witnesses and be subject to cross-examination.

The letter should not have been introduced. However, we conclude that although its use was in error, that error was harmless. That is, we find that the conclusion reached by the lower court is supportable even without resort to the correspondence and therefore we will not reverse on these grounds.

We explained in *Kessler v. Gregory,* 271 Pa.Super. 121, 124–25, 412 A.2d 605, 607 (1979):

Among the factors to be considered in determining the best interests of the child are the character and fitness of the parties seeking custody, their respective homes, their ability to adequately care for the child, and their ability to financially provide for the child. *Shoemaker Appeal,* 396 Pa. 378, 381, 152 A.2d 666, 668 (1959). However, " 'Unless the income of one party is so inadequate as to

preclude raising the [child] in a decent manner, the matter of relative incomes is irrelevant.' " (Citations omitted.)

There is no indication in the record that the income of any of the parties is so inadequate as to preclude raising Michael. Both Mr. and Mrs. Moorman testified that their family lives in a three bedroom, two bath house. Mrs. Moorman explained that there is a yard adjacent to the house. Mr. Moorman earns $28,000 a year as a systems programmer and is a college graduate pursuing a masters degree. Mrs. Moorman is not employed outside the home and cares for their young daughter.

Although we would have preferred to see testimony from an impartial observer as to the physical surroundings of the Moorman house, we are satisfied that the lower court had sufficient basis to conclude that they were adequate. Mr. Tingle, who had visited that home, did not contest the testimony of the Moormans in this regard; in fact, on cross-examination, he said that theirs is a "nice home." [4]

■ We also disagree with appellants' claim that separate counsel should have been appointed to represent Michael's interests. Of course, there is ill will between the parties, as appellants claim. We note, however, that there is almost always bitterness between the parties to a custody fight. The facts of this case do not indicate special circumstances requiring that Michael be represented separately. Both parties, while disagreeing as to how best to help Michael, nevertheless focused on his best interests. Independent counsel was not necessary. See *Palmer v. Tokarek*, supra.

We observe finally that although the parties to this case may presently bear some ill feelings towards one another, it is clear that they all love Michael and that Michael needs the love and affection of both the mother and the grandparents. It would certainly help Michael to adjust to his new

4. We believe that we have herein responded to appellants' issues nos. 2 and 4.

home, as well as to develop into a full, happy person, if his mother and grandparents could get along.

Orders affirmed.