473 A.2d 1021

**In re ADOPTION OF MICHAEL J.C.**

**Appeal of BARBARA C.**

Superior Court of Pennsylvania.

Argued Sept. 19, 1983.

Filed March 2, 1984.

Petition for Allowance of Appeal Denied April 30, 1984.

144

148

Suzanne Noble, Chester, for appellant.

Joseph E. Lastowka, Jr., Media, for appellee.

Howard Richard, Media, for participating party.

Before SPAETH, President Judge, and CAVANAUGH, McEWEN, BECK, MONTEMURO, MONTGOMERY and CERCONE, JJ.

MONTGOMERY, Judge:

This is an appeal by the natural mother from an order terminating her parental rights.[1]

Barbara C. was 17 years old at the time of Michael's birth on April 24, 1981. Approximately one month before his birth, she decided to place her child for adoption and made arrangements with an attorney who was to act as the intermediary. While she was still in the hospital recuperating from the baby's birth, Barbara executed an Affidavit of Consent and surrendered the child to the intermediary who then turned the child over to George and Barbara A., the preadoptive parents. On June 8, 1981, a Report of Intent to Adopt was filed. Some time during the summer, Barbara contacted the intermediary and requested visitation with Michael and his ultimate return to her. When these re-

---

1. By order dated January 7, 1982, the putative father's parental rights were terminated pursuant to 23 Pa.C.S.A. § 2511(a)(1). He has never contested this determination and he is not involved in this appeal.

quests were denied, Barbara filed a habeas corpus petition, on August 12, 1981. This petition was transferred to the Orphans' Court Division on September 14, 1981, and a hearing was scheduled for October 20, 1981. On September 16, 1981, Barbara's request for visitation was denied without a hearing. The petition to involuntarily terminate Barbara's parental rights was not filed until October 27, 1981. Further delays ensued and hearings were finally held on January 5, 6 and 7, 1982. Ultimately, the Honorable Francis Catania entered an order terminating Barbara's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2). Barbara appealed and a panel of this court affirmed with Judge Lipez dissenting. Barbara's petition for reargument before the court *en banc* was granted.

■■■ Barbara first argues that the trial court erred in failing to recognize that she had timely revoked her consent to the adoption and in failing to order Michael's return to her immediately upon such revocation. The natural parent's "right" to revoke a consent to adoption is derived from the Adoption Act, 23 Pa.C.S.A. § 2101 *et seq.* The general rule is that the natural parent's consent to an adoption is required. 23 Pa.C.S.A. § 2711(a)(3).[2] Regardless of § 2711, however, consent is not required if the parent's rights have already been terminated or if, after notice and hearing, the court finds that grounds for involuntary termination exist under § 2511 of the Act. 23 Pa.C.S.A. § 2714. Thus, the revocation of consent by a natural parent does not automatically halt the adoption proceeding. Rather, it triggers an inquiry into the statutory grounds for involuntary termination set forth in § 2511(a). *Commonwealth ex rel. Grimes v. Yack*, 289 Pa.Super. 495, 433 A.2d 1363 (1981). These are:

2. In 1982, § 2711 was amended to set forth certain requirements of a valid consent. We note at this point that the consent in the instant case does not fulfill all of those requirements and, thus, would be invalid were those amendments applicable here. This would not change our reasoning, however. We note it only to underscore the importance of proceeding with caution in cases of this nature.

(1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(3) The parent is the presumptive but not the natural father of the child.

(4) The child is in the custody of an agency, having been found under such circumstances that the identity or whereabouts of the parent is unknown and cannot be ascertained by diligent search and the parent does not claim the child within three months after the child is found.

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the condition which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a).

In terminating Barbara's rights, Judge Catania specifically relied on § 2511(a)(2). We are not, therefore, dealing with the six-month period set forth in § 2511(a)(1). *Cf., Commonwealth ex rel. Grimes v. Yack, supra; K.N. v. Cades*, 288 Pa.Super. 555, 432 A.2d 1010 (1981)[3]. For these rea-

**3.** We do not believe this changes the settled law that consent can be revoked within six months and the child will be returned to the

sons, we cannot accept appellant's argument that her revocation of consent within six months required the trial court to return Michael to her and terminate the adoption proceeding.

Appellant's main argument centers around the applicability of § 2511(a)(2) to the involuntary termination of parental rights of a natural parent within the factual context presented here; that is, where the natural parent voluntarily surrenders the child for adoption to an intermediary, who is not an agency (a "private" adoption), the surrender takes place prior to the mother's discharge from the hospital after the birth, and the mother revokes her consent to the adoption within six months (so as to make § 2511(a)(1) inapplicable).

In any context, the complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take, carrying with it great emotional impact for both the parent and the child. *In re Adoption of Sarver*, 444 Pa. 507, 281 A.2d 890 (1971). The right to conceive and raise one's children has long been recognized as one of our basic civil rights. *Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Freedom of personal choice in matters of family life, and the concomitant freedom from unwarranted governmental intrusion, is a fundamental liberty interest protected by the Fourteenth Amendment. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Because of the importance placed on the family unit, governmental intrusion into the family, and disruption of the parent-child relationship, is warranted only in exceptional circumstances. Even when such intrusion is warranted, it must be accompanied by every possible effort to reunite the family. *Matter of M.L.W.*, 307 Pa.Super. 29, 452 A.2d 1021 (1982). Termination of parental rights does more than disrupt the parent-child relationship; it totally

natural parent where the only ground for termination of parental rights would be § 2511(a)(1).

destroys it. "The termination of parental rights, however, means that the child is dead so far as that parent is concerned." *In re William L.*, 477 Pa. 322, 383 A.2d 1228 (1978) (Manderino, J., dissenting). The standard of proof is the same whether the termination action is brought by the state or by private individuals because of the state's *parens patriae* interest. *In re T.R.*, 318 Pa. 460, 465 A.2d 642 (1983).

■ Involuntary termination of parental rights can only be accomplished through the statutory scheme set forth in the Adoption Act and only as an aid to adoption. *In re B.E.*, 474 Pa. 139, 377 A.2d 153 (1977). To effect an adoption, this statutory scheme must be strictly complied with. *In re Adoption of E.M.A.*, 487 Pa. 152, 409 A.2d 10 (1979). With these principles in mind, we turn to an examination of the particular statutory provision relied upon.

Prior to the Adoption Act of 1970, the only basis for terminating parental rights was abandonment. *Jones Appeal*, 449 Pa. 543, 297 A.2d 117 (1972). The additional grounds of parental incapacity, abuse or neglect appeared as § 311(2) in the 1970 Act. Section 2511(a)(2) of the Adoption Act of 1980, the section relied upon here, is a verbatim reenactment of § 311(2); therefore, the substantive law developed under § 311(2) is continued under § 2511(a)(2). *Christner v. Christner*, 366 Pa. 41, 76 A.2d 361 (1950).

■ In order to terminate parental rights under this "parental incapacity" section, three things must be shown: (1) repeated and continued incapacity, abuse, neglect or refusal which (2) has caused the child to be without essential parental care, control or subsistence, and (3) the causes of this incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975). If any of these elements are missing or insufficiently proven, the court cannot terminate the parent's rights. *See, e.g., Jones Appeal, supra* (a single act does not demonstrate *continuing* incapacity so as to justify termination).

Appellant contends that, since Michael was never in her physical custody, the requirements of the statute could not be proven because her conduct could not have caused him harm. While we agree with appellant that the "causation" element must be proved before parental rights can be terminated, and that this element was not sufficiently proved in this case, we need not go so far as to hold that the causation element can never be proved unless the parent has physical custody of the child. *Cf., In re Interest of Black*, 273 Pa.Super. 536, 417 A.2d 1178 (1980).

■ Factually, the trial court relied in part on a variety of admittedly serious problems Barbara had when she was 15 and 16 years old. These included use of illegal drugs and alcohol, sexual promiscuity, one hospital admission for alleged drug or alcohol overdose, at least two incidents of alleged violence—one toward her mother and one toward a child who lived in the same apartment complex, an admission to Delaware County Children's Cottage, dropping out of school, and taking a trip to Florida without her mother's permission. However inappropriate such behavior might be, we believe that such behavior alone, without a showing of the effect on the child, is an insufficient basis on which to terminate parental rights.

■ In both neglect and custody cases, we have required such a nexus. For example, in *In re Rinker*, 180 Pa.Super. 143, 117 A.2d 780 (1955), it was held that a mother's adultery and excessive use of alcohol did not warrant a finding that her children were neglected because the evidence revealed that these activities took place away from the home and the children and the children were apparently adequately cared for. In custody cases, "immoral conduct" must be shown to adversely affect the welfare of the child before it can be considered as a factor in determining custody. *See, e.g., Commonwealth ex rel. Myers v. Myers*, 468 Pa. 134, 360 A.2d 587 (1976) (meretricious relationship). Since the legal standard in these types of cases is less stringent than that required to terminate parental rights, we do not hesitate to use them to support

our position that such a causal connection is also required in termination cases. *See also, Matter of M.L.W., supra* (mother's I.Q. of 65 given undue weight); *In re Custody of Myers,* 242 Pa.Super. 225, 363 A.2d 1242 (1976) (difference in income irrelevant unless it vitally affects the child's welfare); *In re Custody of Temos,* 304 Pa.Super. 82, 450 A.2d 111 (mother's relationship with married man and mother's career-mindedness not shown to have adverse effect on children); *Commonwealth ex rel. Peterson v. Hayes,* 252 Pa.Super. 487, 381 A.2d 1311 (1977) (father's violence toward mother, outside the presence of the children, insufficient to deny visitation).

In the instant case, the particular incidents listed in the trial court's opinion occurred for the most part at least one year prior to Michael's birth and two years prior to the hearing and no evidence was presented to show that Barbara's conduct adversely affected him; (for example, there is no evidence of addictive drug use during her pregnancy which adversely affected his health). In addition, we are cognizant of the principle that one's past misconduct is not controlling where a parent is presently fit. *Commonwealth ex rel. Horton v. Burke,* 190 Pa.Super. 392, 154 A.2d 255 (1959). We cannot, therefore, affirm the termination order on this basis.

The only other evidence presented in support of the termination petition was the testimony of two psychiatrists, both of whom had evaluated Barbara solely for the purpose of this proceeding. For several reasons, we are unable to find that this testimony is sufficient to support the termination order.

In the first place, this evidence does not completely fulfill the requirements of § 2511(a)(2). The most obvious omission is the lack of testimony concerning the element of remediability. Both of appellees' experts opined that Barbara was presently incapable of parenting. This alone is insufficient because termination cannot be ordered if there is a reasonable possibility that the causes of incapacity can

be remedied. *In Interest of C.M.E.*, 301 Pa.Super. 579, 448 A.2d 59 (1982).

 It is on this point that we observe a crucial distinction between what occurred in this "private" adoption and what would have been required if an agency had been involved—the elements of notice and opportunity to correct any deficiency. In response to an argument that § 311(2) (the predecessor of § 2511(a)(2) is unconstitutionally vague, our Supreme Court has held that the "remediability" requirement excludes the possibility that a parent's rights will be terminated when the parent has insufficient notice of what conduct is required or prohibited. *In re William L.*, *supra*. Indeed, in that case, Justice Roberts noted that

> ... the requirement that the conduct be shown to be irremediable could be met rarely, if ever, absent evidence that the deficiencies in parental conduct had been identified, and the parent was nonetheless unwilling or unable to modify the conduct to remedy the situation.

*Id.*, 477 Pa. at 332 n. 5, 383 A.2d at 1232 n. 5.

Although the petitioner in *William L.* was an agency, rather than a private individual as in the instant case, this difference cannot change the burden of proving all the elements of § 2511(a)(2). *See, In re T.R.*, *supra*.

 We note as well that in "agency" adoptions the court must consider the services or assistance offered by or available from the agency before determining that the parent's incapacity cannot or will not be remedied. 23 Pa.C.S.A. § 2511(a)(5). While we certainly do not mean to imply that an agency be involved in every adoption,[4] we think it might be advisable in many "private" cases for the trial court to determine what assistance is available to the parent, whether the parent is aware of such services and whether any attempt has been made to procure such assistance. In this way the court could avoid the double standard problem often present when parental rights are terminated

4. Any change in the status of "private" adoptions, which have long been recognized as valid, must come from the legislature.

in a "private" proceeding when such rights could not have been terminated in an "agency" proceeding.

However, even if the experts' opinions had addressed all the elements of § 2511(a)(2), we would be unable to affirm a termination order based only on such evidence.[5] Both the United States Supreme Court and the Pennsylvania Supreme Court have held that an order terminating parental rights must be supported by clear and convincing evidence, a more demanding standard than the preponderance of the evidence standard permissible in other cases. *Santosky v. Kramer, supra; In re T.R., supra.* Since appellant had not had the opportunity of parenting her child, the experts' opinions were basically predictions of Barbara's parenting capabilities, based at least in part on her past conduct as enumerated above. While such information might well be an important element of Barbara's life for therapeutic purposes, it was not relevant to terminating her parental rights. The interests of the therapist and the interests of the law are not necessarily the same. *Commonwealth ex rel. Grimes v. Yack, supra.*

More important, however, is the fact that the expert testimony involved in this case was predictive in nature; that is the experts were expected to render their opinion on whether Barbara would be able to parent when, because of the factual circumstances of the case, she had no opportunity to do so. The problem with relying on this type of evidence as a basis for terminating parental rights was somewhat understated by one of appellant's experts: "Predictability is very difficult" (T.1/6/82 p. 377). Our research in this regard reveals not only that it is difficult to predict that a person will behave in a certain way but that expert opinion which predicts behavior is not particularly reliable.[6]

5. It does not appear that the trial court gave too much weight to the expert testimony but rather based its order primarily on the past conduct discussed previously in this opinion.

6. Indeed, one commentator has gone so far as to state that psychiatric judgments have not been shown to be substantially more reliable and valid than "a procedure by which judges flipped coins...." Ennis &

*See, People v. Burnick,* 14 Cal.3d 306, 121 Cal.Rptr. 488, 535 P.2d 352 (1975); and Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom,* 62 Cal.L.Rev. 693 (1974) for a collection and discussion of the studies done in this area. Without other evidence of parental incapacity, we do not believe the speculative type of testimony presented in the instant case constitutes clear and convincing evidence of parental incapacity. *See, Matter of Mark T.,* 296 Pa.Super. 533, 442 A.2d 1179 (1982) (Beck, J., Concurring Opinion).

Appellees contend that § 2511(b), a section added to the Adoption Act in 1980, modifies § 2511(a)(2) by mandating that the court take into consideration the "best interests of the child." Specifically, this section provides:

> (b) **Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

We disagree with appellees for two reasons. First, we do not find the concepts of the "best interest of the child" and the "needs and welfare of the child" to be interchangeable. The "best interests" standard traditionally has been applied to custody disputes. *Commonwealth ex rel. Bender v. Bender,* 197 Pa.Super. 397, 178 A.2d 779 (1962). Where the issue is visitation, or partial custody which closely resembles visitation, a stricter standard prevails; that is, visitation can be denied only if the parent possesses such severe mental or moral deficiencies as to constitute a grave threat to the welfare of the child. *Scott v. Scott,* 240 Pa.Super. 65, 368 A.2d 288 (1976); *Commonwealth ex rel. Turner v. Strange,* 179 Pa.Super. 83, 115 A.2d 885 (1955). The "best interests" standard is not the correct principle to apply to visitation cases. *In re Damon*

Litwack, Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom, 62 Cal.L.Rev. 693, 743 (1974).

*B.*, 314 Pa.Super. 391, 460 A.2d 1196 (1983). If such a standard cannot be used to limit a parent's relationship with her child, surely it cannot be used to sever such a relationship completely.[7] Rather, we believe that the words "needs and welfare" mean something quite different from the "best interests." The former phrase denotes certain minimum requirements that all children are entitled to—adequate housing, clothing, food and love—whereas the latter connotes a weighing of two adequate but unequal situations (traditionally, the respective households of mother and father). Our Supreme Court has, in the past, refused to sanction the termination of parental rights where the children are fed and clothed, are in generally good health, and are not abused although the home is "submarginal" and the children might suffer from cultural deprivation. *In re Geiger, supra.* As noted most eloquently by the Honorable Robert E. Woodside, the law

> was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy.

*In re Rinker, supra,* 180 Pa.Superior Ct. at 148, 117 A.2d 783 (1955).

Secondly, the addition of § 2511(b) to the Adoption Act does not abrogate the requirements of § 2511(a). Section 2511(b) does not contain an additional ground for terminating parental rights; such grounds are contained in § 2511(a) only. Thus, until the requirement of § 2511(a) are met, there is no need to consider § 2511(b). *Commonwealth ex rel. Grimes v. Yack, supra.* We must, therefore,

---

7. "If a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest, I should have little doubt that the State would have intruded impermissibly on 'the private realm of family life which the state cannot enter' ". *Smith v. Organization of Foster Families,* 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (Stewart, J., Concurring Opinion).

reverse the order of the lower court terminating Barbara's parental rights.

Appellees have argued that this interpretation of the Adoption Act and the result we have reached will compel an all-or-nothing result; that is, unless parental rights are terminated, nothing could be done until some harm actually occurs to the child. We stress, however, that our decision in this regard relates only to the termination of Barbara's parental rights; the determination of custody is a separate issue. There are numerous intermediate possibilities—temporary foster care, visitation, assistance to Barbara in learning appropriate parenting skills—between irrevocably terminating her parental rights and granting her unrestricted custody.

This brings us to the final issue in this matter—the determination of who should have custody of Michael at the present time. Appellant contends that a reversal of the termination order automatically requires that custody be granted to her whereas appellees argue that the evidence supports a determination that Michael's best interests require that custody be granted to them. The resolution of this issue is made even more difficult because Michael has now been in the custody of appellees for over two years and, because Barbara's visitation petition was denied, he does not even know his natural mother. While some of this delay can be attributed to the court system itself (*but see, In re Davis*, 502 Pa. 110, 465 A.2d 614 (1983) (even "normal" delays resulting from crowded court calendars "cannot be tolerated in child placement cases."), at least one continuance resulted because appellees' counsel had another trial scheduled at the same time as this one. In addition, Michael's lack of a relationship with his mother could have been avoided had appropriate visitation been ordered. We find the denial of Barbara's visitation petition without a hearing to be a highly unusual procedure; indeed, we do not see how the trial court could possibly determine that visitation would constitute a grave threat to the child's welfare, *Scott v. Scott, supra,* without receiving any evidence.

Nevertheless the damage is done and the issue that must be decided is whether Michael should remain in appellees' custody,[8] whether appellant should be awarded custody or whether some intermediate solution is preferable.

A custody determination, of course, must be based on the present circumstances of the parties. *In re Leskovich*, 253 Pa.Super. 349, 385 A.2d 373 (1978). Over two years have passed since the hearings in this matter. Those hearings dealt only with the termination issue and not with Barbara's petition for custody or visitation. Therefore, we believe the appropriate course to be to remand this matter for proper consideration of this petition and for development of the complete and comprehensive record required in custody matters. *See, In re Custody of White*, 270 Pa.Super. 165, 411 A.2d 231 (1979).

The order of the court below terminating the parental rights of Barbara C. is reversed and the case is remanded for proceedings not inconsistent with this opinion. Jurisdiction is not retained.

McEWEN, J., files a dissenting opinion.

McEWEN, Judge, dissenting:

The respect that I have for the insight of the distinguished author of the majority opinion, my learned colleague, Judge Harry M. Montgomery, is exceeded only by my conviction that appellant should not be permitted to tear this child from the love of the couple—the parents—into whose care she had thrust the child.

**8.** Of course, in this case, as in any custody dispute between a natural parent and a third party:
 ... the parties do not start out even; the parents have a "prima facie right to custody," which will be forfeited only if "convincing reasons" appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the parents' side. *In re Custody of Hernandez*, 249 Pa.Super. 274, 286, 376 A.2d 648, 654.
 See also, *In re Desiree B.*, 304 Pa.Super. 461, 450 A.2d 1003 (1982); *Commonwealth ex rel. Gorto v. Gorto*, 298 Pa.Super. 509, 444 A.2d 1299 (1982); *Palmer v. Tokarek*, 279 Pa.Super. 458, 421 A.2d 289 (1980).

Appellant was seventeen years old and single when, on April 24, 1981, she was delivered of the baby boy who is the subject of this proceeding. Appellant had for some time pursued her desire to place the child for adoption by completion of arrangements through an intermediary and, three weeks before the birth of the baby, on April 2, 1981, appellant appeared before the court, together with her mother and the named intermediary, to testify upon her request that the court order the intermediary to provide for the payment to her of the sum of three thousand dollars ($3,000.00) for recuperative expenses. The court approved the proposed disbursement after full hearing, held in chambers, at which appellant, after being advised of available alternatives to the placement of the child for adoption, declared her intention to place the infant for adoption after birth and agreed that the intermediary should provide for the placement of the child for adoption. It is to be noted that during the hearing, the appellant specifically rejected the alternatives to adoption that the court had carefully detailed and stated her belief that it would be in the best interest of the child if he were to be raised in a family setting and "have a father", a setting in which he could have a "better life". The mother of Barbara C. at the hearing on April 2, 1981, not only expressed on the record her approval of the decision to place the child for adoption but also, in her capacity as guardian of her daughter, consented to the proposed adoption.

On April 28, 1981, four days after the birth of the baby, appellant executed an Affidavit of Surrender and Consent to Adoption and surrendered custody of the child through the intermediary into the hands and care of the adoptive couple. The mother of Barbara C. participated in the surrender of the custody of the child to the intermediary on April 28, 1981, by joinder as a witness to the execution by her daughter of the Affidavit of Surrender and Consent to Adoption. Appellees, the adoptive couple, proceeded under § 2531 of the Adoption Act of 1980 to file, on June 8, 1981, a report of intention to adopt the child. Appellant, more

than three months after she had surrendered custody of the child and had executed the Affidavit of Surrender and Consent to Adoption, filed on August 12, 1981, a petition for writ of habeas corpus to secure the return of the child to her custody. The adoptive couple filed a petition for involuntary termination of the parental rights of the natural mother on October 27, 1981. The court consolidated the actions and after the completion of lengthy and intense hearing proceedings, the trial judge terminated the parental rights of the mother under § 2511(a)(2) of the Adoption Act of 1980, 23 P.S. § 2511(a)(2) (supp. 1982–83) [1], and awarded formal custody of the baby to appellees.

The trial court set forth quite a number of findings of fact upon which it based the determination that the parental rights of appellant should be terminated and there was, in my review, abundant competent evidence to support those findings of fact.

The trial judge considered the fact that appellant ran away from home at an early age and was required to be admitted to the Delaware County Childrens' Cottage as a result of physically abusive behavior directed by her toward her mother. The court further noted that appellant had verbally abused one small child and had admitted to police that she had assaulted a five year old child whom she was

---

[1]. The putative father's rights were terminated under § 2511(a)(1), which provides:

**§ 2511. Grounds for involuntary termination**

(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) the parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

The putative father has never contested this determination, and is not involved in this appeal. The petition for termination of the parental rights of the natural mother also raised § 2511(a)(1) with respect to her, but appellees abandoned this claim after pleading it in the petition, presumably as a result of the expression by the natural mother of the revocation of her consent to the adoption of the child within six months after custody was surrendered to the adoptive parents.

babysitting, even though appellant herself at the termination hearing denied that she had struck the child.

There was considerable testimony concerning alcohol and drug abuse by appellant that would indicate such abuse was not occasional but was part of a behavior pattern that not only preceded but also followed the commencement of her pregnancy. A substantial basis for this conclusion is demonstrated by the notes of the physician appearing in a hospital emergency room record for September 1, 1980, that appellant is "well known here, with history of drug abuse and psychological problems, also currently pregnant ...". These notations were made eighteen months after appellant was admitted to the hospital for drug overdose, after an admitted consumption of alcohol and "angel dust", and transferred to a mental hospital for treatment of her suicidal ideation, where her condition was diagnosed as "Drug Dependence, Alcohol Dependence [and] Depressive Neurosis", even though she denied any drug or alcohol problem.

The promiscuous nature of appellant was well demonstrated to the court by the testimony of her girlfriend that appellant generally had sex "with whomever she was going out with" at the time and the information supplied by her own brother that she would have intercourse with different boys even though she had just met them one-half hour earlier.

The court noted that appellant had a violent temper demonstrated not only by her assault upon the five year old child for whom she had been babysitting but also by the physical abuse upon her own mother as well as upon her own friend as a result of which formal charges were filed against appellant before a District Justice. The court concluded appellant was unable to maintain habitable living quarters as a result of testimony from a friend of appellant and from the landlord of appellant that her apartment was filthy, that there was dog feces on the floor of the apartment and that the walls of the apartment were marred with painted obscene words as well as a large hole caused when

appellant hurled a saxaphone during a dispute with her mother.

The court found the behavior of the appellant during the trial itself revealed "a marked tendency to filter out the truth of her past behavior." That conclusion is certainly exemplified by the indication of appellant that she would return to school and also secure employment but would be able to care for the child as a result of financial aid from her grandmother and public assistance as well as the help of her grandmother in the actual care of the child. That plan of appellant belied the fact that the grandmother would have been unable to provide such care by reason of a disabling nerve disease compounded by chronic back problems and ignored the inability of appellant to maintain passing grades in high school as well as her eventual decision to leave school entirely. As much as these findings reflect the character and parental incapacity of appellant, they also form a sufficient basis for the finding of the court that appellant did not have a realistic plan for the care of the child were she to be awarded custody of the child.

The determination of the court that appellant could not be a capable parent for the child would seem to be the only possible conclusion that could be drawn from a consideration of the behavior of appellant as well as of the conclusions reached by the psychiatric experts, Leo C. Freeman, M.D. and Herman D. Staples, M.D., both of whom had examined appellant shortly before the trial and had had the benefit of a psychological evaluation by Bruce E. Mapes, Ph.D., whose report forms a part of the record. Dr. Freeman concluded that "she was in no position at this time to assume the responsibility of an infant"; that she "presents a serious mental illness which makes her unable to parent"; that "the baby would be endangered if he were placed with the mother [B.C.] in her present marked emotional instability, with little tolerance to frustration and capacity for mature judgment"; and that to place the child in the custody of appellant "would be detrimental to his welfare and expose him to psychological damage." Dr. Staples, a

specialist in child psychiatry, testified that he diagnosed appellant as having a "severe personality disorder of the histrionic type", that symptoms of such a personality disorder include depression and attempts at suicide as well as psychotic breaks with reality, and that individuals with such a disorder have poor relationships with other individuals and are very self-centered, egocentric and demanding of attention. He concluded that the disorder "would have a very unfortunate effect" upon her potential role as parent of an infant child and that she "would not be able, because of her emotional condition, to be a desirable, effective parent". He further observed that there was an unfavorable prognosis concerning the benefit to appellant of some form of psychotherapy. While the demonstrated behavior of appellant and the medical testimony form a more than full basis for the conclusion of the court that the parental incapacity of appellant was irremediable, that conclusion becomes insurmountable upon consideration of the statement of the father of appellant, with whom she had had the better parental relationship, that she "lacks the capacity to be a mother for a child at this time because she is not caring, mature responsible and not ready to assume the obligations of a mother. I don't feel that that child would be fed properly or clothed properly."

The distinguished President Judge Francis J. Catania in expressing his decision declared:

This court finds that from the evidence adduced at the trial [the natural mother] has demonstrated a repeated and continued emotional pattern throughout her life, of emotional instability which has been manifested by her involvement with drugs and alcohol, her domestic problems, including her temporary commitments to Haverford State Hospital and the Delaware County Children's Cottage, her sexual promiscuity, her inability to handle her financial affairs in a responsible fashion, and her difficulty in relating and maintaining interpersonal relations.

\* \* \* \* \* \*

[Barbara C., the natural mother,] has shown a repeated and continued incapacity to parent, and the causes of said abuse have not been remedied within the meaning of the Adoption Act, 23 Pa.C.S.A., § 2511(a)(2).

Due to the psychiatric and psychological testimony presented and the record of [the natural mother's] history this court does not believe the causes will be remedied.

The provision of the Adoption Act of 1980 which is the subject of our scrutiny in this appeal, namely, § 2511(a)(2), declares:

(a) *General Rule*—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 P.S. § 2511 (supp.1982–83).

This provision of the Adoption Act of 1980 is identical to § 311(2) of the Adoption Act of 1970. The Supreme Court, in *In Re: William L.*, 477 Pa. 322, 383 A.2d 1228 (1978), *cert. denied*, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1979), upheld § 311(2), the predecessor to § 2511(a)(2), in the face of constitutional challenge and construed the enactment to require proof of three elements before parental rights may be involuntarily terminated: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *Id.*, 477 Pa. at 345, 383 A.2d at 1239, *citing, In Re: Geiger*, 459 Pa. 636, 639, 331 A.2d 172, 174 (1975).

The majority focuses upon the second of these requirements and concludes that however delinquent and irresponsible appellant may be, § 2511(a)(2) requires that a parental incapacity be demonstrated vis-a-vis the very child who is the subject of the proceeding:

> However inappropriate such behavior might be, we believe that such behavior alone, *without a showing of the effect on the child,* is an insufficient basis on which to terminate parental rights. (Maj. Opinion at 9.) (emphasis supplied)

This, despite the demonstration by the mother during the period prior to the birth and thereafter of those same characteristics which prove her parental incapacity—an incapacity of such a nature and so deeply seated that, according to the psychiatric prognosis provided to the hearing court, it cannot be remedied. I cannot accept the majority opinion. Rather, I share the view of the hearing judge. when he declared:

> The [appellant] has made much of the argument that § 2511(a)(2) should not have been applied in this case as the [appellant] did not have physical custody of the child, and therefore, did not continuously and repeatedly abuse, neglect or refuse to care for the child. *In Re Howard,* 468 Pa. 71, 360 A.2d 184 (1976), and *In Re Folcarelli,* 457 A.2d 130, 19 D & C 3d 407 (1982). Basically, [appellant's] argument would require the child [to] suffer some type of physical, emotional or mental impairment before a parent's rights could be terminated under this section, even in situations where it is clear that the mental or emotional make-up of the parent is such that there is no possibility that harm to the child would not ensue. The Court does not believe that the legislature ever intended such a harsh and unthinking result. From a careful reading of the *Howard* case, supra, it appears that while an argument can be made that § 2511(a)(1) & (2) are not interchangeable, the real key to the case is that the incapacity *cannot* or will not be remedied. (emphasis in original).

The interpretation of the majority that the parental incapacity must be demonstrated vis-a-vis the very child who is the subject of the proceeding will always preclude the hearing court from the entry of a decree of involuntary termination of parental rights in every situation where the natural mother, who has formally consented to an adoption and has surrendered actual custody of the child to the adoptive parents immediately after birth, changes her mind—despite abundant and even overwhelming evidence of her continued incapacity. While a narrative reading of § 2511(a)(2) might permit such an interpretation, the consequences of such a construction are so anomalous that the legislature could not have imposed such a requirement, since such a requirement would compel, despite clear and convincing evidence that the parental capacity cannot be remedied, the return of a child to a parent to await demonstration by the parent upon the child of such incapacity. Could the legislature have possibly intended to place children in such peril? And because Providence may spare a few of such children from a permanent, irreparable harm as a result of such parental incapacity or abuse and neglect, can it be said the legislature would engage in a type of Russian roulette with all of said children?

It is not necessary to respond to such entreaties to conclude the legislature did not intend to impose such a requirement since the legislature itself, in the immediately following sub-section of the Adoption Act, 23 P.S. § 2511(b), provided, *inter alia,* the following mandate:

*The court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child.* (emphasis supplied).

I consider so clear and certain a directive as determinative of this issue.

The majority hearkens to traditional variations in the standards applicable to visitation, custody and termination cases but the legislature precluded such further liberty in termination cases when it proclaimed that "the needs and welfare of the child" were to be the primary considerations

in termination cases. Nor does it seem fit or appropriate to apply the standard for cases of neglectful parents to a biological parent who abandoned—in every *de facto* sense— her child. Whether the description by the majority of the sacred right of parenthood is viewed as a deft rationale or an inspirational declaration, that description but serves to distract from the command of the statute that such rights are subordinate to the needs and welfare of the child and to divert from the clear and certain conclusion that the behavioral history of appellant hardly summons the vision of an individual to whom the responsibility of parenthood is sacred. However fervently lawyers may address and however carefully judges may analyze the difference between visitation, custody and termination cases and proceed to separately define "the best interests of the child" and "the needs and welfare of the child", can it be doubted that the layman will not accept such claims of distinction but would insist that this child should be permitted to remain with the adoptive parents? I too so insist. And would so rule.