**In re E.M.M.**

C.P. of Bucks County, No. 2011-9034.

*Rhonda Sherrod,* for mother.
*Francine Kaplan,* for father.
*Brad Jackman,* for CYS
*Christine McMonagle,* guardian ad litem.

MCMASTER, *J.,* July 12, 2011—C.C. (hereinafter referred to as "mother") has appealed our May 20, 2011, Decree granting the petition of Bucks County children & Youth Social Service agency (hereinafter referred to as the "agency") to terminate mother's parental rights as to E.M.M., Jr., and A.R.M. (hereinafter referred to as "children"). Mother is the natural mother of both children. Both children were adjudicated dependent in Bucks County on February 8, 2010. A lengthy evidentiary hearing regarding both children spanned two days and was held on May 12, 2011, and May 13, 2011. On May 12, 2011, prior to commencing the hearing regarding mother's parental rights, children's putative father, E.M.M., participating via telephone, voluntarily relinquished his parental rights as to children.

## BACKGROUND

E.M.M., Jr., was born to mother on June 24, 2003. A.R.M. was born to mother approximately three years later on February 24, 2006. Children initially came into the care of the agency on February 8, 2010. However, in July 2008, children came into the care of their paternal aunt and uncle, Teresa and Gary Merrigan, and have been residing with that family ever since. Children have not resided with mother or E.M.M. since prior to July 10,

2008.

Mother, currently age 29, is a high school graduate with a further diploma from DBT Business School in web development, and she has some completed college credits. N.T. 5/12/2011, p.77; Ex. M-6. She is currently unemployed, but she does have work experience as a legal secretary. N.T. 5/12/2011, p.77; Ex. M-6. Mother has been independent since the age of 19 and has maintained her own household in some form or another since then, with a short stint in a homeless shelter at an unknown time. N.T. 5/12/2011, p.82. She currently resides in a studio apartment in Philadelphia, which she acknowledges would not be an appropriate arrangement for a mother with two children residing with her. N.T. 5/12/2011, pp.31-32. Mother's current income consists of approximately $175 a week in unemployment compensation. N.T. 5/12/2011, p.32. Her current rent payment is $600 a month, and she receives assistance in the form of food stamps. N.T. 5/12/2011, p.113. With her remaining funds every month, she spends approximately $50 maintaining a cell phone, $83 on a transit pass, and $15 every two weeks, on pay day, purchasing the illegal drug PCP. N.T. 5/12/2011, pp.113, 118. Mother acknowledges that PCP remains in her system for weeks at a time. N.T. 5/12/2011, p.104. Mother acquires her drugs in what appears to this court to be a drive-by drug deal in a gas station parking lot. N.T. 5/12/2011, p.106. Mother's drug of choice has the street name "wet," and she ingests it by smoking a cigarette dipped in PCP. N.T. 5/12/2011, p.106. Mother also realizes that she is ingesting a substance that consists at least partly of embalming fluid. N.T. 5/12/2011, p.107.

Mother's PCP habit is the primary reason the children

came into the care of Teresa and Gary Merrigan. Teresa Merrigan testified that she had concerns early on in her relationship with mother that mother was actively using drugs, and those concerns continued after both children were born. N.T. 5/13/2011, pp.5-6. On July 10, 2008, the children began residing at the Merrigan residence. N.T. 5/13/2011, p.8. On July 16, 2008, mother and E.M.M. returned, ostensibly to pick their children up and prevent them from going on vacation with the Merrigans. N.T. 5/13/2011, p.8. However, though mother and E.M.M. were indicating that they wanted the children returned to them, mother simultaneously gave Ms. Merrigan the children's birth certificates, Social Security cards, and insurance cards, and permitted them to go on vacation. N.T. 5/13/2011, pp.9-10. Ms. Merrigan then realized that both mother and E.M.M. were presently under the influence of some substance while this conversation was occurring. E.M.M. admitted he had used drugs prior to arriving at the Merrigan home, and mother stated she only took what her doctor had given her. N.T. 5/13/2011, pp.9-10. Mother and E.M.M. later that day decided to give the Merrigans temporary guardianship of both children, and that decision is memorialized in Exhibit GAL-1. Their reasons for doing so are stated in GAL-1, and Ms. Merrigan indicated that she discussed with mother her reasons for granting guardianship to the Merrigans. "The meaning was that she would go into a rehab program and try to stay off of the drugs that she was continually using." N.T. 5/13/2011, p.19. Mother had also added that the Merrigans would have guardianship of the children until she was financially stable. Ex. GAL-1.

Mother has had an ongoing substance abuse problem

since prior to when her children began living with the Merrigans and continuing until the present time. Ms. Merrigan testified that she had an inclination that mother and E.M.M. were both using drugs. On July 10, 2008, E.M.M. was admitted to the hospital after becoming unresponsive following his drug use. N.T. 5/13/2011, p.10. Mother spoke with Ms. Merrigan later that day, and mother admitted that she was also currently using drugs, but wanted to get help. Both mother and E.M.M. requested that Ms. Merrigan take the children to the Merrigan home while mother and E.M.M. dealt with their drug issues. N.T. 5/13/2011, p.12. As previously discussed, mother and E.M.M. arrived at the Merrigan residence six days later on July 16, 2008, attempting to collect their children. Both parents were under the influence of some substance at that time. Since then, mother has been in and out of inpatient and outpatient rehabilitation programs, but she still is a regular user of PCP and has not indicated that this will change anytime in the near future.

Once the children began living with the Merrigans, mother would visit about once every two weeks. However, the Merrigans were forced to end mother's visits in February 2009 due to mother's inappropriate behavior around the children. N.T. 5/13/2011, p.20. On one occasion, mother improperly supervised A.R.M., the youngest brother, while putting him down for his nap. Mother fell asleep and allowed A.R.M. to roam the room alone, destroying various papers in the Merrigans' home office and pouring water on the furniture. A.R.M. would have been about two or three years old at that time. When confronted, mother's only explanation was "that she was tired." N.T. 5/13/2011, p.21. At her last

visit, mother demonstrated behaviors that suggested she was under the influence while visiting her children. "She would start talking about one thing and in midstream of a sentence change to another. Very agitated, very short with the children. It just - it wasn't like her normal visits had been going." N.T. 5/13/2011, p.22. After this visit, the Merrigans no longer welcomed her to their home to visit her children. Mother did not visit with her children until after the agency became involved, at least a year later.

After mother lost her privileges to visit the Merrigan home, her drug problem became more entrenched. In September 2009, she spent two weeks as an inpatient at Fairmount Behavioral Health, but left against medical advice. N.T. 5/12/2011, p.34. From October 2009 through December 2009, mother attended outpatient treatment at Self, Incorporated. After a short break from treatment, mother spent nearly a month as an inpatient at Kirkbride, from February 24, 2010 through March 18, 2010. Following her discharge from Kirkbride, she entered intensive outpatient treatment at The Wedge, attending treatment three times a week. N.T. 5/12/2011, pp.34-35. During her time in treatment, however, mother continued to regularly use drugs. During her 2010 treatment, mother tested positive for drug use numerous times. While at The Wedge, she had positive drug tests in April and May 2010. N.T. 5/12/2011, pp.36-37. Mother also admitted to the agency on four occasions in May and June 2010 that she was using PCP. N.T. 5/12/2011, pp.38-39. In June 2010, mother began attending Narcotics Anonymous at two locations: New Horizons and Freedom Through Recovery. N.T. 5/12/2011, pp.40-41. At the end of June, however, she was still using drugs, as she admitted to the

agency on June 29 that she was doing so. N.T. 5/12/2011, p.41. Around the time of her June disclosure to the agency, she began attending outpatient treatment again at Self, Incorporated. Self, Incorporated performed drug tests there, and mother stated, "Every urine I gave there was positive for PCP." N.T. 5/12/2011, pp.41-42. In July, mother admitted, during a hearing before the Dependency Court in Bucks County, that she was using drugs at that time.

Following her statement to the Dependency Court, mother continued attending treatment at self, incorporated. Between July 2010 and February 2011, she tested positive for drug use at least thirteen times. N.T. 5/12/2011, pp.43-44. On March 4, 2011, mother was accepted for inpatient treatment at Friends Hospital. She denied to this court that she denied treatment, but she did not actually receive treatment once she was accepted. N.T. 5/12/2011, p.45. By the end of March 2011, mother had stopped attending outpatient treatment at Self, Incorporated. N.T. 5/12/2011, p.45. She admitted to this court that she continues to use drugs, even while attending Narcotics Anonymous. She testified that she uses drugs when she is under stress, but that if she had her children back, she would not experience stress and so would not need the drugs anymore. N.T. 5/12/2011, p.47. She explained that though she's unemployed, if her children were returned to her, she would not be under any stress to provide for them because her family would assist her. However, she provided no documentation or the testimony of her family members to support this claim. N.T. 5/12/2011, pp.47-49.

Mother's supervised visits with the children have

occurred about every two weeks since the children were adjudicated dependent and the agency became involved. Mother testified that she believes the visits have gone well. She testified that the children are happy when they are with her, and become sad when the visits are over. N.T. 5/12/2011, pp.54, 58, 75. Mother stated that the visits were representative of how she would normally act with the children, and that if the children were returned to her, the "only behavior that would change would be [her] substance abuse problem." N.T. 5/12/2011, p.76. Christine Melton, the Bethanna visitation social worker, contradicted mother during her own testimony. Ms. Melton testified that the visits have not gone particularly, well, especially recently. She testified the children tend to ignore mother, and it is difficult for her to get them involved in an activity. N.T. 5/13/2011, p.73. Ms. Melton has discussed this with mother, but mother tends to redirect those discussions to other topics. N.T. 5/13/2011, p.75. According to Ms. Melton, the children tend to easily separate from mother and usually have to be prompted to hug her goodbye. N.T. 5/13/2011, pp.80, 82. Ms. Melton also reported that mother missed a visit on March 3, 2011, with no reason given, and on at least one home visit with mother when the children were absent, mother exhibited behavior that suggested to Ms. Melton that mother was under the influence of some substance. N.T. 5/13/2011, pp. 114-115. Finally, Ms. Melton reported that mother consistently views her visits with the children differently than do third party observers. N.T. 5/13/2011, p.118.

Ms. Merrigan's testimony threw more light on mother's visits with the children. Ms. Merrigan testified that she encouraged the children to have positive visits with

mother, but that she noticed behavior problems before and after visits. N.T. 5/13/2011, pp.27-29. In April 2010, prior to visits, E.M.M., Jr., was getting in trouble at school when he knew that visits would be occurring, and A.R.M. would get angry and violent. N.T. 5/13/2011, p.28. After visits, the children would be yelling in the car on the way home, and A.R.M. would hit E.M.M., Jr., while E.M.M., Jr., responded with insults directed to his brother. Ms. Merrigan testified that this behavior is not normal for the children. N.T. 5/13/2011, p.29. Since then, the children's behavior has calmed, but E.M.M., Jr., still gets in trouble at school and experiences stomachaches at bedtime, while A.R.M. tends to be withdrawn prior to visits. N.T. 5/13/2011, p.30. Furthermore, neither of the children ask for mother or indicate that they miss her, and Ms. Merrigan testified to her opinion that neither child is bonded to mother. N.T. 5/13/2011, pp.31, 40. Ms. Merrigan also testified that she and Mr. Merrigan are prepared to adopt the children. N.T. 5/13/2011, p.35.

The agency, at this time, believes the termination of both parents' rights in this case would be in the best interest of the children and would meet their needs and welfare. N.T. 5/13/2011, p.124. The agency also would be inclined to consent to the Merrigans' adoption of the children. 5/13/2011, p.124. Hope Boyle, the agency caseworker, testified that the relationship between the children and the Merrigans is one of a close-knit family, where the children have integrated so seamlessly into the Merrigan family that an outside observer would not be able to tell that the children are not the Merrigans' natural-born children. N.T. 5/13/2011, p.122. Ms. Boyle also reported that the children are affectionate towards

all members of the Merrigan family, and that affection is reciprocated. N.T. 5/13/2011, p.123. The guardian ad litem, Christine McMonagle, agreed with the agency in that the termination of mother's parental rights would be appropriate in this case. N.T. 5/13/2011, p.135.

The agency filed its petition for Involuntary Termination of mother's parental rights to both children on February 24, 2011, and a hearing was scheduled. The agency simultaneously filed for involuntary termination of the rights of the children's father, E.M.M., however, E.M.M. voluntarily relinquished his parental rights to both children during the hearing on May 12, 2011. The agency sought termination under 23 Pa.C.S. §2511(a)(2), (5) and (8). These subsections provide, in pertinent part:

(a) General rule. - The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period

of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

## APPELLANT'S STATEMENT OF ERRORS COMPLAINED OF ON APPEAL

Mother filed a notice of appeal on June 13, 2011. Her appeal was accompanied by a concise statement of matters complained of on appeal, as required by Pa.R.A.P. 1925(a)(2), which we have reproduced here, verbatim.

1. The trial court erroneously granted Bucks County Children & Youth's ("BCC&Y") petition to terminate the parental rights of natural mother as BCC&Y failed to prove incapacity, abuse, neglect, or refusal by natural mother caused the child to be without essential parental care, control or subsistence necessary for the child's physical or mental well being as required under § 2511(a)(2).

2. The trial court erroneously granted BCC&Y's petition to terminate the parental rights of natural mother as BCC&Y failed to prove that mother could

not or would not remedy the conditions which led to the removal of the child as required under § 2511(a)(5).

3. The trial court erroneously granted BCC&Y's petition to terminate the parental rights of natural mother under § 2511(a)(8) and [§] 2511(b) in that BCC&Y failed to prove that the involuntary termination of the natural mother's termination of [sic] parental rights would best serve the needs and welfare of the child.

## STANDARD OF REVIEW

Our duty, when considering a termination of parental rights petition, is twofold. We must determine whether the agency, the party bearing the evidentiary burden, has demonstrated that the statutory grounds for termination of parental rights have been met. Once we determine the agency has met that burden, we must decide whether the termination of parental rights meets the best interests of the child. 23 Pa.C.S. § 2511.

The agency's evidentiary burden, as the petitioning party, was to demonstrate by clear and convincing evidence that grounds existed to terminate mother's parental rights. *In re Z.P.*, 994 A.2d 1108, 1116 (Pa. Super. 2010) (citing *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa. Super. 2002)); see also *In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006). "The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *In re Z.P.*, 994 A.2d at 1116 (citing *In re. J.D.W.M.*, 810 A.2d 688, 690 (Pa. Super. 2002)).

Upon appeal, the appellate court's "scope of review

is broad and comprehensive, but [its] standard of review is narrow." *In re C.P.*, 901 A.2d at 520. The appellate court will only determine whether our findings, entitled to reasonable deference, are supported by competent evidence and whether we adequately considered the effect our decision would have upon the needs and welfare of the child. *In re I.J.*, 972 A.2d 5, 8 (Pa. Super. 2009) (quoting *In re S.D.T., Jr.*, 934 A.2d 703, 705-06 (Pa. Super. 2007)). The trial court, as the fact finder, determines witnesses' credibility and is the "sole and final arbiter of all conflicts in the evidence." *Id.* Absent an abuse of discretion, insufficient evidentiary support or an error of law, our decision must be upheld. *In re Z.P.*, 994 A.2d at 1115. Our decision must be affirmed if our findings are supported by competent evidence, "even if the record could support an opposite result." *Id.* at 1116.

## DISCUSSION

By terminating a parent's rights to her child, a court interferes with that parent's basic constitutional right to raise her child in the manner in which she so chooses. *In re J.W.*, 578 A.2d 952, 957 (Pa. Super. 1990) ("The custody, care, nurture, and instruction of children resides first in the children's natural parents, as a constitutionally recognized fundamental right.") A decision to terminate parental rights "is one of the most serious and severe steps a court can take, carrying with it great emotional impact for the parent and the child." *In re C.P.*, 901 A.2d at 520 (citing *In re Bowman*, 647 A.2d 217, 218-19 (Pa. Super. 1994)). A court's intrusion into the family structure is only warranted in exceptional circumstances and only when it is clearly necessary to intrude. *In re Matsock*, 611 A.2d 737, 742 (Pa. Super. 1992) (quoting *In re Adoption of Michael J.C.*, 473 A.2d 1021, 1026 (Pa. Super. 1984) and

*In Interest of C.M.E.*, 448 A.2d 59, 63 (Pa. Super. 1982)). However, once a parent has demonstrated a "failure to fulfill his or her parental duties," the parent's basic constitutional right to parent her own child converts "to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B.L.L.,* 702 A.2d 1007, 1013-14 (Pa. Super. 2001).

Our initial focus in a termination hearing is upon the conduct of the parent when we consider the various avenues for termination of parental rights listed in §2511(a). Once we have determined that the parent's conduct, or lack thereof, calls for termination of her parental rights under any of the §2511(a) subsections, we turn to "whether the termination will clearly promote the welfare of the child." *Id.* at 1013. "Above all else in determining whether parental rights should be terminated, adequate consideration must be given to the needs and welfare of the child." *In re J.D.W.M.,* 810 A.2d 688, 690 (Pa. Super. 2002). §2511(b) instructs us to consider the impact the termination of parental rights will have on the welfare and needs of the child. We are to consider a number of factors, including the "nature and status of the parent-child bond," the "importance of continuity of relationships to the child," "whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re I.J.,* 972 A.2d 5, 12 (Pa. Super. 2009) (citing *In re K.Z.S.,* 946 A.2d 753, 760 (Pa. Super. 2008)). We are also to consider other intangible factors, "such as love, comfort, security, and stability." *In re C.M.S.,* 884 A.2d 1284, 1287 (Pa. Super. 2005).

The agency filed for termination of mother's parental

rights under three subsections of 2511(a): 2511(a)(2), (5) and (8). Pet. p.2. Though the agency argued that termination was appropriate under all three subsections, mother's parental rights could have been appropriately terminated if only one of those selected subsections was satisfied and we appropriately analyzed the 2511(b) considerations. *In re Z.P.*, 994 A.2d at 1117. The agency was required to prove, by clear and convincing evidence, all of the elements outlined in a particular selected subsection, reproduced above. Mother argues in her appeal that the agency failed to prove selected elements of 2511(a)(2), (5) and (8), and thus that the agency failed to fully satisfy any of the subsections that would allow for termination of mother's parental rights. We determined that agency met its burden under all three subsections, and that termination of mother's parental rights was in the best interest of the children under §2511(b).

§2511(a)(2) requires that the agency prove that mother's repeated and continued incapacity, abuse, neglect or refusal to parent caused the children to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, etc., cannot or will not be remedied by the parent. The Superior Court has held that grounds for termination of a parent's rights "'are not limited to affirmative misconduct.'" *In re Z.P.*, 994 A.2d at 1117 (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002)). §2511(a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being." *Id.* (quoting *In re E.A.P.*, 994 A.2d 79, 82 (Pa. Super. 2008)). Furthermore, this subsection has been read to assert "'that when a parent has demonstrated a

continued inability to conduct his . . . life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and convincing evidence, the termination of parental rights is justified."' *In re Z.P.,* 994 A.2d at 1118 (quoting *In re Adoption of Michael J.C.,* 486 A.2d 371, 375 (Pa. Super. 1984)).

The children in this case have officially been in the agency's care since February 2010, but were voluntarily placed with the Merrigans in July 2008. From the testimony and evidence presented to this court, particularly GAL-1 and Ms. Merrigan's identifying testimony, mother placed the children with the Merrigans because she realized that her substance abuse problem was creating an unsafe environment for her children. Mother was, by her own admission on GAL-1 and Ms. Merrigan's testimony regarding the day GAL-1 was created, unsure about mother's financial situation and understood that she needed to seek professional help to remove the drugs from her life. As of today, mother has refused to relinquish her PCP habit, and even acknowledges that her current housing arrangement, a studio apartment, is an unsuitable residence for a family of three. She has not demonstrated the ability or the motivation to live a life independent of illegal substances, and that concerns this court. Mother testified that she understood her reunification goals as laid out by the agency early on in this case. She testified that she understood that her sobriety and housing situation were the main issues preventing her reunification with the children. N.T. 5/12/2011, p.53. It is clear that mother understands that her reunification with her children was nearly entirely within her control. She chose to continue inviting PCP

into her life, and she understood the consequences of that choice.

Though we are instructed to "examine the individual circumstances of each case and consider all explanations offered by the parent facing termination," we are also to look at the evidence "in light of the totality of the circumstances" to determine if the evidence "clearly warrants the involuntary termination." *In re B.*, N.M, 856 A.2d 847, 855 (Pa. Super. 2004). While mother obviously cares greatly for the children, her recent history demonstrates an inability to provide for a child's basic needs, including physical safety. A child requires "love, protection, guidance, and support" as well as stable, appropriate housing and the other physical necessities of life. It is a parent's duty to provide these things, and they "cannot be met by a merely passive interest in the development of the child." *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003) (quoting *In re Burns*, 474 Pa. 615, 624, 379 A.2d 535, 540 (1977)). While mother has attended numerous treatment programs for her addiction, she continues to abuse substances though she realizes that her choices are preventing her from regaining custody of the children. She clearly understood in July 2008 that her drug abuse created an unsafe environment for the children and prevented her from providing the essential care that they needed, and she made a conscious decision to move them into the Merrigan home while she attempted to get help for her addiction. Since then, mother has refused to remove the one major thing from her life that is holding her back. The source of mother's inability to appropriately parent the children is her substance abuse problem, and mother utterly refuses to remove that source from her life. This court found that the agency clearly met its burden

under §2511(a)(2). We also concluded that the agency met its burden under §2511(a)(5) and (8), which we will now discuss.

The children had been in the care of the agency for approximately fifteen months at the time of the evidentiary hearing in May 2011. Clearly, the agency has met the time requirements of §2511(a)(5) and (8). The issues that led to the agency's involvement with mother's private arrangement with the Merrigans are clearly still issues mother needs to deal with. Her drug addiction continues to be a regular feature in her life, and her housing situation leaves much to be desired as she has not indicated she has a plan to find more suitable housing arrangements. Mother has had a significant amount of time with which to deal with her substance abuse demons and overcome her drug addiction. Not only has she had the fifteen months during which the agency has been involved to attain and maintain sobriety, she had approximately eighteen months before that while her children were in the care of the Merrigans. The Merrigans even provided mother with the motivation to sober up when they ended her visits to their home. Mother has been provided with and has even sought out her own treatment programs during this time period totaling about thirty-three months, nearly three years. Unfortunately, none of these programs has made an impact. Mother has only been sober, by our calculations, for less than a month and that was while she was in inpatient treatment at Kirkbride from February to March 2010. Mother asserted that her substance abuse would cease once she regained custody of the children, but she has not demonstrated an ability to refrain from using drugs in order for this court to find that testimony credible. She was abusing substances while she had custody of the children

prior to July 2008, and she has demonstrated nothing to suggest that she would suddenly stop using drugs once she regained custody. For the above reasons, we found that the agency met its burden under §2511(a)(5) and (8).

As the agency clearly fulfilled the statutory requirements for termination of parental rights outlined under §2511(a)(2), (5) and (8), we next embarked on an analysis of whether termination of mother's parental rights would best serve the needs and welfare of the children. We are instructed by the case law to consider "whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P.*, 994 A.2d at 1121. We are not required to use expert testimony in this analysis, nor are we required to have a formal bonding evaluation completed. *Id.*

While it is obvious in this case that mother is bonded to both of her children, a "parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *Id.* (citing *In re L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007)). It is clear to this court that both children have bonded to the Merrigans and the Merrigans' adult and minor children who also live in their household. Ms. Boyle's testimony, as a representative of the agency, was particularly telling. Ms. Boyle described the Merrigan household as a cohesive family unit, where the children look to the Merrigans as their own parents. "If I didn't know any better, I would have thought that they were their own children. The children go to the Merrigans for their every need." N.T. 5/13/2011, p.122. The children are affectionate toward the other members of the Merrigan family, and that affection is reciprocated. N.T. 5/13/2011, p.123. While the children's visits with mother appear to operate smoothly,

the children's behavior before and after their visits is quite significant. The behavior of both becomes noticeably changed for the worse prior to visits and immediately following visits, when they experience anger issues and physically and verbally pick on each other. E.M.M., Jr., the oldest of the two, has on at least one occasion spent a visit repeatedly asking when the visit would be over. N.T. 5/13/2011, p.78. Both of the children separate easily from mother, even running to Ms. Merrigan's car at the end of visits when Ms. Merrigan comes to collect them. N.T. 5/13/2011, p.82. Both Ms. Merrigan and Ms. Melton, the Bethanna social worker, reported that neither child has asked for mother in her absence or indicated that he might miss her. N.T. 5/13/2011, pp. 31, 83-84. While mother clearly loves the children, there does not appear to be an existing, reciprocal, necessary and beneficial relationship between mother and the children.

Additionally, the Merrigans provide both of the children with the stable home life that children need in order to thrive. In their present setting, the children are not exposed to regular, consistent drug use, nor are they subjected to a parent who manages her stress by ingesting illegal substances. The children have lived with the Merrigans for approximately three years now. The youngest child, A.R.M., has known the Merrigan home as his home for more than half of his young life. Both of these children turn to the Merrigans for love and comfort when they need it, just as they look to the other children in the home for emotional support and affection.

It is clear, based on the testimony of Ms. Merrigan and Ms. Boyle, as well as Ms. McMonagle's report as the guardian ad litem, that our decision that this would best

serve the children's needs and welfare was the correct decision and would not sever an existing beneficial relationship or result in irreparable harm to the children. Therefore, the remaining elements of §2511(a)(5) and (8), as well as the entirety of §2511(b), have been proven by the agency.

Mother's unchecked substance abuse problem led her to place the children with the Merrigans in July 2008, and drove the agency to take further action regarding the children in February 2010. Mother's addiction continues to play a substantial role in her life, and she has not credibly indicated to this court that she is able or willing to end her relationship with PCP. All of mother's attempts at substance abuse treatment have failed, and though she is active in Narcotics Anonymous, she continues to abuse illegal substances on a regularly scheduled basis. Mother has had nearly three years to fight her addiction; additional time to seek treatment will not have a sufficient effect on her situation. The children have been in the full care of the Merrigans since July 2008 and the agency since February 2010, and it is time that they be assured the stability that is essential to the healthy development of children. "The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). For all of the foregoing reasons, we granted the agency's petition to terminate the parental rights of mother as to the children.