J-A19027-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| S.L.R. AND K.A.R. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| R.V., K.M., C.L.V., AND T.A.V. | |
| Appellee | No. 612 EDA 2016 |

Appeal from the Order January 29, 2016
In the Court of Common Pleas of Northampton County
Civil Division at No(s): No. C-48-CV-2014-10175

BEFORE:  FORD ELLIOTT, P.J.E., OTT, J., and FITZGERALD, J.[*]

MEMORANDUM BY OTT, J.:                **FILED OCTOBER 17, 2016**

S.L.R. ("Maternal Grandmother") and K.A.R. ("Maternal Step-Grandfather") (collectively, "the Appellants") appeal from the January 29, 2016 custody order in the Court of Common Pleas of Northampton County which denied their custody complaint for primary physical and shared legal custody of the minor male child, N.R.V., born in February of 2006 ("Child").  We affirm in part, reverse in part, and remand in accordance with the following memorandum.

In its opinion accompanying the subject order, the trial court set forth factual findings, which the testimonial evidence supports.  As such, we adopt

_____

[*] Former Justice specially assigned to the Superior Court.

them herein. *See* Trial Court Opinion, 1/29/16, at 4-8. For purposes of background, we summarize the following factual and procedural history.

R.V. ("Father") and Y.M. ("Mother") separated when Child was approximately seventeen months old, and they subsequently divorced. N.T., 8/12/15, at 54. At the time of their separation, Father and Mother resided in Macungie, in Lehigh County. Trial Court Opinion, 1/29/16, at 5, ¶ 7. In 2009, the Lehigh County Court of Common Pleas awarded Child's parents shared legal custody, Mother primary physical custody, and Father partial physical custody. Custody Complaint, 10/22/14, at Exhibit A.

Mother died on July 27, 2011, following a brief illness. Trial Court Opinion, 1/29/16, at 5, ¶ 11. At the time of her death, she was married to K.M. ("Stepfather"), and she continued to live in Lehigh County. *Id.* at ¶ 10. Child resided with Stepfather during the 2011-2012 school year, when he attended kindergarten. *Id.* at ¶ 13. During that period of time, but on a date unspecified in the record, custody litigation commenced between Father and Stepfather in Lehigh County.[1] On August 20, 2012, the Lehigh County Court of Common Pleas issued an agreed-upon order granting Father and

_____

[1] In November of 2011, the Appellants filed a custody complaint in the Lehigh County Court of Common Pleas against Father and Stepfather, wherein they requested partial physical custody. Custody Complaint, 10/22/14, at Exhibit B. In December of 2012, the court dismissed the Appellants' action for failure to request a trial within 180 days pursuant to Pennsylvania Rule of Civil Procedure 1915.4(b) (Listing Trials Before the Court). *Id.* at Exhibit C.

Stepfather shared legal custody, Father primary physical custody, and Stepfather partial physical custody. Custody Complaint, 10/22/14, at Exhibit E. By that time, Father had remarried and was living in Sellersville, in Bucks County.

On December 17, 2013, C.L.V. ("Paternal Uncle"), and his wife, T.A.V. ("Paternal Aunt") (collectively, "the Custodians"), who reside in Bethlehem, in Northampton County, filed a custody action in the Lehigh County Court of Common Pleas against Father and Stepfather, wherein they requested primary physical custody. The parties entered into a written stipulation and agreement that granted Father and the Custodians shared legal custody, the Custodians primary physical custody, and Father partial physical custody pursuant to a schedule set forth therein. Further, partial physical custody was granted to the remaining parties, upon mutual agreement, and not pursuant to a set schedule.[2] On March 24, 2014, the court entered an order incorporating the written stipulation and agreement between the parties ("Lehigh County order"). In addition, the court relinquished jurisdiction of the custody action "to Northampton County, or any other county which becomes the home county of the minor child." Custody Complaint, 10/22/14, at Exhibits J-K.

_____

[2] By that time, in addition to Stepfather, the remaining parties included the additional defendants, E.R.V. ("Paternal Grandfather") and L.B.V. ("Paternal Grandmother"). The Appellants were not defendants in the action.

On October 22, 2014, the Appellants, who resided in Alburtis, in Lehigh County, initiated a custody action in the Northampton County Court of Common Pleas against Father and Stepfather, wherein they requested primary physical and shared legal custody. The Appellants served the Custodians with the complaint as interested parties. The Custodians filed a petition for intervention and confirmation of custody on January 7, 2015. On January 22, 2015, the Appellants filed preliminary objections to the petition, wherein they asserted that the Custodians did not establish a claim for custody, "as any prior [o]rders entered were without proper standing[] and without proper notice to" the Appellants. Preliminary Objections, 1/22/15, at ¶ 16. On February 11, 2015, the Custodians filed an answer and new matter wherein they requested that the court affirm the Lehigh County order.

A custody trial occurred on July 15, August 11-12, and September 14, 2015.[3] The Appellants testified on their own behalf, and they presented the testimony of Ronald J. Esteve, a licensed psychologist whom the Northampton County custody master appointed to perform co-parenting counseling; and Officer William Stanton, a police officer with the Bethlehem Township Police Department. Father testified on his own behalf, and he

_____

[3] Importantly, at the beginning of the trial, Stepfather withdrew his request for continuing contact with Child, and counsel stipulated to his withdrawal from the case. N.T., 8/11/15, at 5-6.

- 4 -

presented the testimony of Luke Roan, the cub master of Child's Cub Scouts; and Melissa O'Donnell, Child's Cub Scouts den leader. The Custodians testified on their own behalf, and they presented the testimony of Jenna Zsilavecz, Child's third grade teacher; T.T., Child's maternal aunt; and Gloria Velazquez, a licensed clinical social worker who provided counseling to Child. In addition, Child testified *in camera* in the presence of the parties' counsel and the Guardian *ad litem* ("GAL").

By order dated January 29, 2016, and entered on February 1, 2016, the trial court denied the Appellants' request for primary physical and shared legal custody. Further, the court affirmed the custody arrangement set forth in the Lehigh County order. In addition, the court directed that, "it is *not* in the best interests of the child that [the Appellants] be granted partial physical custody. However, visitation[4] shall occur as agreed by the parties, and absent countervailing concerns threatening the emotional or physical well-being of the child, the [ ] [C]ustodians are encouraged to grant [the Appellants] liberal contact with the child." Order, 1/29/16, at 21 (emphasis added). The Appellants timely filed a notice of appeal and a concise

_____

[4] We observe that the Child Custody Act ("Act"), 23 Pa.C.S.A. §§ 5321-5340, does not use the term "visitation." **See** 23 Pa.C.S.A. § 5322(a). Rather, the Act identifies the relevant terms as "partial physical custody," "shared physical custody," and "supervised physical custody." **Id.** Therefore, we construe the term "visitation" in the subject order to mean partial physical custody.

statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i) and (b).

On appeal, the Appellants present the following issues for our review:

I. Did the trial court abuse its discretion: by failing to recognize the Appellant[s'] [ ] "in local parentis" status; by denying the Appellant[s'] [ ] petition for custody and by failing to award the Appellant[s] [ ], at minimum, regular custodial periods?

II. Did the trial court abuse its discretion: by granting custody of the subject child to the [Custodians] where they had failed to establish "in loco parentis" status; by failing to address procedural irregularities and inadequacies in the interim pleadings, including notice requirements to the Appellant[s] [ ]; and by failing to consider the relevant pleadings including the Appellant[s'] [ ] preliminary objections?

III. Did the trial court abuse its discretion: by failing to apply appropriate weight to the testimony of the court appointed co-parent counselor, Dr. Ronald Esteve; and by applying undue reliance and weight upon the findings and report of the Guardian ad litem?

Appellants' brief at 27.

Our scope and standard of review in custody matters is as follows.

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. **Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record.** We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

- 6 -

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted) (emphasis added).

Further, we have stated the following.

[T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006), *quoting*

*Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

The primary concern in any custody case is the best interests of the child. The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being. *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006), *citing* *Arnold v. Arnold*, 847 A.2d 674, 677 (Pa. Super. 2004).

Initially, we note that, "[f]or purposes of a custody dispute, persons other than the natural parents are considered 'third parties.'" *McDonel v. Sohn*, 762 A.2d 1101, 1105 (Pa. Super. 2000), *appeal denied*, 782 A.2d 547 (Pa. 2000). The courts of this Commonwealth have long maintained a "stringent test" for standing in third-party custodial matters because, in part, natural parents have a strong right "to raise their children as they see fit" without intrusion from parties who have no *prima facie* right to custody.

***T.B. v. L.R.M.***, 786 A.2d 913, 916 (Pa. 2001) (citations omitted); ***J.A.L. v. E.P.H.***, 682 A.2d 1314, 1319 (Pa. Super. 1996) (citations omitted). Cognizable rights to custody arise where the legislature specifically authorizes the cause of action, or under the common law doctrine of *in loco parentis*.[5] ***T.B.***, ***supra***; ***J.A.L.***, ***supra***.

In the underlying custody action, the Appellants asserted that they had standing to seek primary physical and shared legal custody pursuant to the following statutory provisions of the Act:

> **§ 5324. Standing for any form of physical custody or legal custody.**
>
> The following individuals may file an action under this chapter for any form of physical custody or legal custody:
>
> . . .
>
> **(2)** A person who stands in loco parentis to the child.
>
> **(3)** A grandparent of the child who is not in loco parentis to the child:
>
>> **(i)** whose relationship with the child began either with the consent of a parent of the child or under a court order;
>>
>> **(ii)** who assumes or is willing to assume responsibility for the child; and
>>
>> **(iii)** when one of the following conditions is met:

---

[5] We note that the Act, *supra*, became effective on January 24, 2011. The relevant provision of the Act incorporates the common law doctrine of *in loco parentis*. ***See*** 23 Pa.C.S.A. § 5324(2).

> **(A)** the child has been determined to be a dependent child under 42 Pa.C.S. Ch. 63 (relating to juvenile matters);
>
> **(B)** the child is substantially at risk due to parental abuse, neglect, drug or alcohol abuse or incapacity; or
>
> **(C)** The child has for a period of at least 12 consecutive months, resided with the grandparent, excluding brief temporary absences of the child from the home, and is removed from the home by the parents, in which case the action must be filed within six months after the removal of the child from the home.

23 Pa.C.S.A. § 5324(2)-(3).

In the alternative, the Appellants asserted that they had standing to seek partial physical custody pursuant to the following statutory provision:

> **§ 5325. Standing for partial physical custody and supervised physical custody.**
>
> In addition to situations set forth in section 5324 (relating to standing for any form of physical custody or legal custody), grandparents and great-grandparents may file an action under this chapter for partial physical custody or supervised physical custody in the following situations:
>
> **(1)** where the parent of the child is deceased, a parent or grandparent of the deceased parent may file an action under this section;
>
> . . .

23 Pa.C.S.A. § 5325(1).

In their first issue on appeal, the Appellants argue only that they stand *in loco parentis* to Child, and, therefore, that the court abused its

discretion in concluding that they did not have standing to seek primary physical and shared legal custody. As such, we do not consider whether the Appellants have standing pursuant to Section 5324(3).

"The phrase '*in loco parentis*' refers to a person who puts oneself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption." **T.B.**, **supra**.

> The status of *in loco parentis* embodies two ideas; first, the assumption of a parental status, and, second, the discharge of parental duties. The rights and liabilities arising out of an *in loco parentis* relationship are, as the words imply, exactly the same as between parent and child. The third party in this type of relationship, however, can[ ]not place himself *in loco parentis* in defiance of the parents' wishes and the parent/child relationship.

**Id.** at 916-917 (citations omitted).

The Appellants argue that the record evidence demonstrates that they satisfied the foregoing two-part test for *in loco parentis* status. They state as follows.

> First, the Maternal Grandparents had assumed parental status of the minor child. The minor child resided with the Maternal Grandparents for a period of three months, and in addition the Maternal Grandparents cared for the child like a parent, for sustained periods of time throughout his life. The Maternal Grandparents have been very involved in the minor child's life and have assumed parental duties. Second, [] Father discharged his parental duties as he essentially relied on others to care for the minor child and take care of the minor child's needs in particular the Maternal Grandparents. As testified to, the Maternal Grandparents would have the child overnight, take the child to school, and then pick up the child for the night at their home, even while the child was supposedly living with the

Father in Sellersville and Maternal Grandparents lived in Macungie, approximately 45 minutes apart.

Appellants' brief at 41-42 (citations to reproduced record omitted). They continue by stating that, "[i]t was not until [] Father, without notice to the Maternal Grandparents, turned custody of the child over, first to his parents, the Paternal Grandparents, and then to his brother and sister-in-law, [] that the Maternal Grandparents' role became diminished." *Id.* at 42 (citation to reproduced record omitted).

In determining that the Appellants failed to establish standing *in loco parentis*, the trial court explained as follows in its opinion accompanying the subject order.

> The evidence demonstrates that for periods during the child's life, [the Appellants] provided regular childcare assistance to Mother, Father[,] and [Stepfather]. However, with the exception of [the Appellants]' testimony that the child lived with them during the three (3) month period when Mother was sick and hospitalized, the court finds that [the Appellants]' role over the course of the child's life has not been parental, but rather that of a childcare provider to assist the child's custodian.

Trial Court Opinion, 1/29/16, at 9.

Maternal Grandmother testified on cross-examination that, from 2008 through sometime in 2011, she assisted in Child's care during the day when Mother worked. N.T., 8/12/15, at 148. She testified that she did not see Child from February of 2011 until April of 2011, because Mother "was upset with me." *Id.* Maternal Grandmother testified that Mother informed her that she was hospitalized on April 28, 2011, where Mother remained until

- 11 -

her death on July 27, 2011. N.T., 8/11/15, at 45. She testified that, during that time-period, Child "stayed with us." *Id.*

During the year following Mother's death, when Child resided with Stepfather, Maternal Grandmother testified that she transported Child to and from kindergarten, volunteered in his kindergarten class, and she assisted with his care. N.T., 8/11/15, at 48, 52. She testified that Child then went to live with Father in Sellersville, and subsequently with Paternal Grandparents in Bethlehem, during which time she continued to see Child on a regular basis. *Id.* at 52-53. Maternal Grandmother testified that, by the fall of 2014, when Child was living with the Custodians, she saw Child less. *Id.* at 54-55. She testified that Paternal Aunt told her "on the phone . . . that we wouldn't be getting regular visitation with [Child]. And she also said, when we did ask for visitation, that we weren't in the [c]ourt [o]rder and she did not have to give us any visitation."[6] *Id.* at 55.

Upon careful review, we conclude that Maternal Grandmother's testimony supports the trial court's finding that the Appellants' role in Child's life was not parental. Rather, the evidence demonstrates that the Appellants assisted Mother, Father, and Stepfather in his care. *Id.* at 43-44. As such,

---

[6] However, the trial court found that the Custodians "ensure that the child regularly visits the [Appellants], typically every Thursday from 3:30pm to 8:00pm, and one weekend overnight a month." Trial Court Opinion, 1/29/16, at 7, ¶ 25 (citations to record omitted). Paternal Uncle's testimony supports the court's finding.

the trial court did not abuse its discretion in failing to confer *in loco parentis* standing upon the Appellants. ***See Argenio v. Fenton***, 703 A.2d 1042, 1044 (Pa. Super. 1997) (holding that the grandmother "acted as no more than a care-taker, in effect, a baby-sitter for the child, albeit a frequent care[-]taker[,]" and that this is not enough to confer *in loco parentis* status). Therefore, we reject the Appellants' argument that the trial court abused its discretion in denying them primary physical and shared legal custody. With respect to their argument regarding partial physical custody, we address it *infra*.

In their second issue, the Appellants argue that the trial court abused its discretion in conferring *in loco parentis* status upon the Custodians. Their argument relates solely to the Lehigh County custody litigation initiated by the Custodians. The Appellants argue that the Custodians did not stand *in loco parentis* to Child at the time they filed their custody complaint because Child then "clearly still resided with the Paternal Grandparents and Father. . . ." Appellants' brief at 44. In addition, they argue that they were not given notice of the Custodians' custody action under Pa.R.C.P. 1915.15. As such, the Appellants argue that the Lehigh County order was entered in violation of Section 5324, *supra*.

In its opinion accompanying the subject order, the trial court stated as follows.

> This [c]ourt is not the proper place to litigate the trajectory of th[e] custody matter through the Lehigh County court system.

> The only matters properly before this court are the standing of the parties to this action, and the best interests of the child.
>
> Moreover, the order granting primary physical custody to the [Custodians] was entered with the consent of Father, who at all times throughout the child's life, has maintained his right[] to physical and legal custody of the child, and who is the child's natural parent.[7] Thus, it is of no consequence to this [c]ourt whether or not the legal process of the Lehigh County proceeding that led to the current custody order was flawed, because[,] if this matter had not preceded in the [Lehigh County] [C]ourt [of Common Pleas], Father would have the unfettered right to determine who could or could not have access to his son or participate in his care and custody.
>
> Finally, the record before this [c]ourt demonstrates that had [the Appellants] been given notice of the December 2013 litigation and participated in the same, they would not have been able to establish standing to seek primary physical custody for failure to stand in loco parentis. The only possible difference in the outcome of the case that could have arisen from their participation would have been an award of partial physical custody, and their right to the same is presently before this [c]ourt . . . .

Trial Court Opinion, 1/29/16, at 10-11. Upon thorough review, the record supports the court's factual findings, and its conclusions are reasonable in light of those findings. As such, we conclude that the Appellants' second issue is without merit.

---

[7] Father testified that, when the Custodians filed their custody action in Lehigh County in December 2013, he "thought about what would be the best for [Child] as far as that situation when it was presented to me. . . . I had to get [Child] in a loving home first and foremost; in a home that [Child] would feel at home in, safe in, and [the Custodians] could provide a very good structure for my son." N.T., 8/11/15, at 155.

In their third issue, the Appellants argue that the trial court abused its discretion by failing to apply the appropriate weight to the testimony of Dr. Esteve, the psychologist appointed by the Northampton County custody master on November 14, 2014 to perform co-parenting counseling. The Appellants assert that Dr. Esteve testified the Custodians were not cooperative with him, and Paternal Uncle was "hostile." Appellants' brief at 46.

It is well-established that we defer to the trial court on issues regarding weight of the evidence. *See C.R.F. v. S.E.F.*, *supra*. Upon review of the testimonial evidence in this case, we conclude that the Appellants' argument has no merit.

By way of background, Dr. Esteve described his goal in co-parenting counseling in this case as assisting the adults "to appreciate how important all of these [adult] relationships are [to Child]. And if they were going to truly help this child, they would help him love the other adults in these relationships." N.T., 7/15/15, at 64. To that end, Dr. Esteve met with the Appellants, the Custodians, and Father. *Id.* at 7. In addition, he met with Child. *Id.* However, Dr. Esteve testified that the Custodians failed to bring Child to a follow-up appointment after Child's visit with the Appellants during Christmas of 2014. N.T., 7/15/15, at 10-11. He testified as follows.

Q. [W]hy was it important for you to see [Child] . . . ?

A. I was very strongly advocating prior to help all the parties to find a way to give [Child] an opportunity to spend time with all

of them. And of course that would include the grandparents. There seemed to be at least some implication that that had been, in itself, disturbing or distressing for [Child], so it would be very appropriate for me to meet with him after the fact to hear directly from him.

*Id.* at 11-12.

Dr. Esteve testified that he contacted Gloria Velazquez, Child's counselor, "because I thought she might be able to give me further insight into [Child]. . . . Also, to assure her that I didn't want her to be concerned that this would in any way be a duplication of services and that my role with [Child] would be much different than hers." *Id.* at 29-30. However, Dr. Esteve testified that Ms. Velazquez "seemed reluctant" about him seeing Child because "she was fearful that it was a duplication of services" for Child.[8] *Id.* at 30-31.

With respect to their assertion that Paternal Uncle was "hostile" to Dr. Esteve, Paternal Uncle testified on cross-examination by the Appellants' counsel as follows.

Q. [Y]ou heard Dr. Esteve's testimony that you became agitated during one of those sessions; is that right?

_____

[8] Indeed, Ms. Velazquez, a licensed social worker, testified that Paternal Aunt contacted her in September of 2013, for counseling of Child with respect to family and bereavement issues. N.T., 9/14/15, at 203-205. She testified that she first met with Child in the fall of 2013, at which time Child suffered from anger, depression, and sadness. *Id.* at 204, 207. Ms. Velazquez testified that Child struggled with bereavement especially during Christmas of 2014; therefore, she advised Paternal Aunt that it was inappropriate for him to meet with Dr. Esteve at that time. *Id.* at 214, 216.

A. According to him.

Q. Well, what happened, according to you?

A. [H]e had his agenda as to what he believed the issues to be, which was to have the [Appellants] get . . . more substantial time with [Child]. And he sort of turned the conversation over to myself, at which point he asked me what did I think. And I told him what I thought. [ ] I thought that the [Appellants] are getting adequate time up to this point, if not as much or more than any other family member.

And he didn't, I guess, like either the tamper [sic] of my response and/or the fact that I was questioning the direction of the conversation. He wanted to push it in. And I just asked him at that point in time if this is supposed to be an open forum to debate, then maybe you should tell me what the answer is that you'd like to hear and I can tell you what it is. I guess he didn't like that response.

N.T., 9/14/15, at 117-118.

Based on the foregoing testimonial evidence, and upon thorough review of the totality of the record evidence, we discern no abuse of discretion by the trial court in failing to weigh Dr. Esteve's testimony in favor of the Appellants in fashioning its custody order. Moreover, the trial court did not appoint Dr. Esteve; rather, the custody master appointed him. In addition, he was not appointed to perform a custody evaluation, but to provide co-parenting counseling. Therefore, we reject the Appellants' argument that the trial court failed to weigh his testimony properly in issuing the subject order.

Next, the Appellants argue that the trial court abused its discretion by relying upon the findings and report of the GAL.[9] The crux of their argument is that the court erred in appointing the GAL. They rely on this Court's decision in **Moorman v. Tingle**, 467 A.2d 359 (Pa. Super. 1983) in asserting that the appointment of a GAL "is necessary only when the child's interests may be adversely affected." Appellants' brief at 48. They assert as follows.

> Thus, it necessarily follows that the services of a [GAL] are unnecessary in a custody action between the parties such as here because, no matter how bitter or contentious the custody fight may be, and irrespective of whether the parties disagree as to what constitutes the child's best interest, all are nonetheless seeking to advance the child's best interest.

*Id.*

---

[9] The trial court agreed with the GAL's conclusion that Maternal Grandmother "is entitled to an important role in [Child's] life, but legally it is not equal to that occupied by the [Custodians] and his Father, and she must accept their ultimate authority over decision[s] as other members of the family do, without the constant conflict." Trial Court Opinion, 1/29/16, at 19 (citation to record omitted). Specifically, the trial court found as follows.

> The [c]ourt shares the GAL's concerns about [Maternal Grandmother's] ability to accept boundaries and to focus on her role as a grandparent rather than seeking to be yet another parental figure in the child's life, which has already been so mired by a significant number of people moving in and out of that role.

*Id.* at 20. Based upon our thorough review of the testimonial evidence, we discern no abuse of discretion by the court in this regard.

In the alternative, the Appellants argue that the trial court abused its discretion by permitting the GAL to act in a role contrary to Rule 1915.11-2(a), which provides that "[t]he [GAL] shall not act as the child's counsel or represent the child's legal interests." Pa.R.C.P. 1915.11-2(a). Specifically, they argue that the GAL overstepped its "statutorily prescribed boundaries" by conducting cross-examination of the witnesses. Appellants' brief at 50; **see also** Pa.R.C.P. 1915.11-2, Note, (stating, "23 Pa.C.S. § 5334 is suspended in so far as it . . . (3) provides the [GAL] the right to examine, cross-examine, present witnesses and present evidence on behalf of the child. . . .")

The record reveals the trial court, on the record in open court on August 11, 2015, issued an order stating that, "based upon a finding of appointment of a [GAL] is necessary to assist the [c]ourt in determining the best interest of the child in this matter," and then made the appointment pursuant to Pa.R.C.P. 1915.11-2. N.T., 8/11/15, at 32-34. Further, the record reveals that the GAL cross-examined the witnesses that testified on the final day of the hearing, September 14, 2015. Notably, neither the Appellants' counsel nor counsel for any of the other parties objected to the appointment of the GAL. **Id.** at 22, 28-29, 32-36. Likewise, neither the Appellants' counsel nor any other counsel objected to the GAL's cross-examination of the witnesses during the hearing on September 14, 2015. As such, the Appellants have waived this issue on appeal. **See In re S.C.B.**,

990 A.2d 762, 767 (Pa. Super. 2010) (quoting **Thompson v. Thompson**, 963 A.2d 474, 475–476 (Pa. Super. 2008)) ("In order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error will result in waiver of that issue.")

Lastly, the Appellants argue that the trial court abused its discretion by failing to award them any time with Child, "except as dictated by" the Custodians. Appellants' brief at 51. We are constrained to agree.

Initially, the trial court concluded that the Appellants have standing to seek partial physical custody pursuant to Section 5325(1), *supra*. In its opinion accompanying the subject order, the court thoroughly considered the requisite list of enumerated factors set forth in Section 5328(a). **See J.R.M. v. J.E.A.,** 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original) (stating that trial courts are required to consider "**[a]ll** of the factors listed in section 5328(a) . . . when entering a custody order").

The court recognized that, "the [Appellants] are entitled to an important role in [Child's] life. They are important simply by virtue of their consistent presence in his life as his grandparents, and the [c]ourt agrees that they should be given reasonable access to the child." Trial Court Opinion, 1/29/16, at 20. However, in considering Section 5328(a)(4), the need for stability and continuity in the child's education, family life and

community life, the court found that Child's "best interests would not be served by the rigors of having a regularly scheduled, court-ordered custodial period under the care of the [Appellants]." *Id.* at 13. The court explained as follows.

> As his grandparents, the [Appellants] are well-positioned to provide the child with a kind of love and familial connection that is unique to their place in his life. However, given the child's age, the fullness of the structure, affection[,] and support he gets from the [Custodians], and the demands of his own schedule, the [c]ourt believes that if the child were to be beholden to a visitation schedule with the [Appellants], that would only put a strain on his educational and community life. Certainly, it is in the best interests of the child, insofar as his family life, to maintain a healthy relationship with the [Appellants], but that should be monitored and scheduled at the discretion of [the Custodians].

*Id.* at 13-14.

We observe that, contrary to the Appellants' assertion, the record supports the court's finding that the Custodians grant them time with Child on a regular basis. *See* Trial Court Opinion, 1/29/16, at 7, ¶ 25 (citations to record omitted). Nevertheless, in light of the testimonial evidence that Child is in counseling for family and bereavement issues, we conclude that it was contrary to his best interests to have the scheduling of visits with the Appellants based solely upon the discretion of the Custodians rather than on an established partial physical custody schedule set forth by court order.

In addition, we observe Paternal Aunt's testimony on direct examination as follows.

Q. Did you believe that you could work with the [Appellants] to get a pattern where everybody can spend some time and share their lives with [Child]?

A. No.

. . .

Q. What would you like to see the [c]ourt do that you believe is in [Child's] best interest?

A. We would just like everybody to work together for [Child].

. . .

Q. Do you believe that you can work out schedules for everybody so that everyone can have some time to share with the [Child]?[10]

A. I have been for a year. And the only person that wasn't happy were [sic] the [Appellants]. And that's why we're here.

N.T., 9/14/15, at 319-320. Based on Paternal Aunt's testimony that the Appellants were dissatisfied with the time she granted them with Child, which then resulted in the underlying custody action, we conclude that it was unreasonable for the court to place the partial custody schedule in her and Paternal Uncle's discretion.

Accordingly, we reverse the subject order insofar as it does not establish a partial physical custody schedule for the Appellants. We remand

---

[10] The record reveals that, in addition to the Appellants, the Custodians permit the following relatives of Mother to spend time with Child: T.T., Child's maternal aunt; A., Child's half-sister, who is Mother's twenty-four-year-old daughter; and N.T., Maternal Grandmother's ex-husband, who is the Child's maternal grandfather. N.T., 9/14/, at 44, 57-59.

this matter to the trial court to consider, in timely fashion, a partial physical custody schedule for the Appellants that will serve Child's best interests. Thereafter, the court shall enter a new order affirming the custody arrangement set forth in the Lehigh County order and granting the Appellants partial physical custody pursuant to a set schedule.

Order affirmed in part, and reversed in part. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/17/2016